COURT OF APPEALS OF VIRGINIA


Present: Judges Annunziata, Bumgardner and Frank
Argued by teleconference


WILLIAM R. SHENK
                                            OPINION BY
v.   Record No. 2723-01-3        JUDGE ROBERT P. FRANK
                                      NOVEMBER 19, 2002
BRENDA C. SHENK


        FROM THE CIRCUIT COURT OF ROCKINGHAM COUNTY
                John J. McGrath, Jr., Judge

        Stephen G. Cochran (William H. Ralston Jr.;
        Lisa L. Knight; The Ralston & Knight Law
        Firm, on briefs), for appellant.

        David A. Penrod (Hoover, Penrod, Davenport &
        Crist, on brief), for appellee.


     William R. Shenk (husband) appeals from a final decree of

divorce entered by the Circuit Court for Rockingham County, which

included an order finding husband and Brenda C. Shenk (wife)

entered into a marital agreement when they signed an "assignment."

Based on this ruling, the trial court determined several

businesses were the separate property of wife.  Husband argues the

"assignment" did not convert marital property into separate

property and the "assignment" was unconscionable.  For the reasons

stated below, we affirm the trial court's ruling.

                    I.  BACKGROUND

     The parties were married in 1981.  In mid-1997, husband

left the marital home in Harrisonburg, Virginia, and did not

return, although he stayed in town and continued his involvement in the family's businesses.  In June 1998, husband left Virginia.  He occasionally returned to visit his children, but he did not live in the Commonwealth nor did he send wife any money for child or spousal support.

When husband left Virginia, he and wife owned several businesses in Harrisonburg.[1]  Shenk Enterprises, a Honda motorcycle dealership, was sold by the parties around the time husband left.  The proceeds from this sale, after the debts were paid, consisted of several promissory notes totaling approximately $375,000, payable over eighty-four months.  The parties also owned and operated the Shenandoah Heritage Farmer's Market (the Market),[2] which rented space to independent stores, and a store within the Market known as Grandma's Pantry.

Prior to their separation, the parties both worked in the Market and Grandma's Pantry.  When the parties separated, these businesses were in financial trouble.  The Market had over $2.2 million dollars in debt on its books and a negative cash flow. The Market's assessed value was $1.75 million as of March 1999. Its construction loan through Community Federal Savings Bank was

---

[1] The parties agree these businesses were originally marital property.

[2] The parties owned sixty percent of the Market, and husband's father owned forty percent.

-

in danger of foreclosure and needed to be replaced by permanent

financing.  Grandma's Pantry was not profitable.

Knowing the state of the businesses, husband decided

unilaterally and secretly to leave Virginia in June 1998.  He

left a letter for wife:

> For sometime now I have been a perceived
> liability and embarrassment to your family,
> my family and I feel to you.  Because of our
> inability to live our lives privately, and
> the relentless pursuit of WBW, my high
> visibility in the community and the belief
> of you and other family around me that I am
> a liability to the success and health of the
> market.  I will no longer settle for that or
> even a zero effect to those close to me.  I
> will and I must for my own health be a
> positive force and a source of pride to
> those around me.  I know that I have the
> ability to make a difference and must find
> out how and were [sic] that is to be.  I
> will be leaving Harrisonburg and not
> returning . . . .
>
> I wish for you happiness, fulfillment,
> contentment, and to finally have a peace
> about who you are.  I do, and will always
> believe that you can do and be anything you
> would like or need to be if you will just
> visualize and believe in yourself.  I
> believe that I have been an overwhelming
> shadow of intimidation for you and at the
> same time have not been able to be all that
> I can be and for that I am sorry.
>
> You and others always thought money was my
> motivation YOU WERE WRONG . . .  I am
> motivated by challenge and the stewardship
> of using or losing my talents . . .  My
> greatest pain comes from the knowledge that
> what really matters is relationships. . . .
> I have always been able to develop
> meaningful relationships (Business and
> Social) with those outside your circle of
> influence. . . .  (Lightspeed, Lemco,

-

> Racing, etc.).  I feel like a hostage with
> Cory, Joy, and Brian, for it seems I can
> only have a relationship with them if it
> includes you "or us" and in that environment
> I do not feel like I am the positive example
> I can be for our children . . .
>
> As for the proceeds from Shenk Honda, SHFM,
> Grandma's Pantry etc., I leave it all . . .
>
> I will do what I can to answer questions and
> give direction in my absence if it is
> desired or needed.

(Ellipses in original).  The letter then listed the proceeds of the Shenk Honda sale.

Husband left town and was never again involved with the businesses.  He made no significant financial contribution to the businesses after he left town,[3] although he claimed, when he returned to town to visit his children, he did some gardening work around the Market.  On one of these return visits, husband told John Bincie, the parties' accountant, that "he was leaving and that he was turning everything over to [wife]."

Wife attempted to refinance the construction loan.  However, officials with Community Federal Savings Bank were concerned about the effect of the parties' divorce on their ability to reach the assets.  Bincie testified, "[T]hey didn't want to get in the middle of a marital asset dispute, so they

---

[3] Husband claims he sent money to pay various bills and expenses.  However, those debts were personal debts of husband.  Additionally, wife testified she could not remember receiving any money from husband, for either the businesses or support, after June 1998.

wanted to know that [husband] was completely out of this as far as having any access to these assets." After negotiating with the bank, Bincie understood the bank wanted the parties to sign an agreement "that would prevent any marital asset issues from coming up after they made the loan."

Steven Weaver, the attorney for the businesses, testified he prepared a document to "transfer all right, title, and interest in those various entities to [wife]." When asked by the trial court if the document was "necessarily a predicate . . . to the Mercantile loan," Weaver responded, "Not that I'm aware of." Wife testified she understood the document "just confirmed what was reality."

On March 19, 1999, husband and wife signed a document labeled an "assignment." The document said, in part:

> 1. [Husband] desires to withdraw as an owner of Shenandoah Heritage Farmers Market, L.L.C. (hereinafter "the Market"), Shenk and Heatwole, Inc. t/a Grandma's Pantry (hereinafter "Shenk and Heatwole"), and Shenk Enterprises, Inc. (hereinafter "Shenk Enterprises").
>
> 2. [Husband] has agreed to assign all of his right, title, and interest, in the aforesaid entities to [wife], individually, and/or the Market, as hereinafter set forth,
>
>     *     *     *     *     *     *     *
>
> 1. [Husband] does hereby give, grant, assign and transfer unto [wife] his 50% membership interest in the Market, thereby giving [wife] a 60% ownership in the Market. . . .

-

> 2.  [Husband] does hereby assign all of his right, title, and interest, both individually and as a shareholder in Shenk Enterprises to [wife]. . . .
>
> 3.  [Husband] does hereby assign, transfer, and convey all of his right, title, and interest, in and to [Grandma's Pantry], to [wife]. . . .[4]

The document noted husband remained "personally liable, to the extent of his current personal liability, on any and all debts of the aforesaid entities."  The "assignment" also recognized wife's agreement "to use her best efforts to continue the business operations . . . [and] to pay the debts, liabilities, and obligations of the aforesaid entities."

With this document, and increased rent payments from Grandma's Pantry, the loan to the Market was refinanced.  The businesses made a profit, for the first time, in 1999, and were expected to improve in 2000.

Husband testified he signed the "assignment" in order to "smooth out the management, to transfer responsibility to get things where they needed to be."  He explained wife was attempting to "destroy" him by destroying the Market, so he wanted to become "a totally separate entity" in the hope that "she won't try to destroy it any longer."  On cross-examination, husband said he believed he needed to sign the "assignment" "[f]or the Community Federal financing."  He claimed he

---

[4] Husband also resigned his positions as president of Shenk Enterprises and Grandma's Pantry.

-

"absolutely" did not intend "to sign away any of [his] marital rights in the property."

The trial court ruled from the bench that the agreement conveyed the properties to wife, as her separate property, under "the provisions relating to marital and premarital agreements" in Code §§ 20-147 through 20-155. The court's order, entered on April 30, 2001, held, "[T]he parties' Assignment of March 19, 1999 is a valid contract and marital agreement." The order explained the court's decision relied mainly on the 1998 letter and the 1999 "assignment." The court noted neither document included a reservation "whereby the husband suggests that these post separation transfers to his wife were anything other than complete and final." The court also found, even if the agreement was invalid, husband was estopped from challenging the "assignment."[5]

## II. ANALYSIS

Husband argues the trial court (1) used the wrong burden of proof and (2) erred in finding the "assignment" was intended to convert marital property into wife's separate property. Husband further argues, even if such intent were present, the assignment is unconscionable and, therefore, unenforceable. We disagree with husband.

---

[5] As we find the "assignment" constituted a valid marital agreement, we do not address this alternative ruling.

-

A.  Burden of Proof

First, husband claims the trial court did not require wife to prove "clearly and unambiguously" under Kelln v. Kelln, 30 Va. App. 113, 515 S.E.2d 789 (1999), that he transferred all his rights, including his marital rights, to her.  However, husband has taken the court's comments out of context.

When the judge announced the decision from the bench, he noted "a curious thing" about the presumption that property is marital property, codified in Code § 20-107.3.  He explained:

> But that presumption is not applicable
> because whatever was conveyed here was
> conveyed to her after the last separation.
> So I don't think we have a question of
> something being presumed to be marital.  But
> in any event I don't really think that's
> dispositive of my ruling, but one of you may
> need it in the Court of Appeals.

Clearly, the court did not ignore the burden of proof.  The judge merely pointed out that the presumption that property received by a spouse is marital property no longer applies after the spouses' last separation.  See Code § 20-107.3(A)(2).

A trial court is presumed to apply the law correctly. Starks v. Commonwealth, 225 Va. 48, 54, 301 S.E.2d 152, 156 (1983); Twardy v. Twardy, 14 Va. App. 651, 658, 419 S.E.2d 848, 852 (1992).  The judge's statement regarding presumption does not indicate the trial court applied an incorrect presumption or

-

burden in this case.  Husband has not overcome the presumption

of correctness.[6]

Additionally, husband did not object to this statement or

any perceived error in application of the burden of proof during

the hearing.  In order to preserve an issue for a ruling by this

Court, the specific argument must be made to the trial court at

the appropriate time, or the allegation of error will not be

considered on appeal.  See Torian v. Torian, 38 Va. App. 167,

185-86, 562 S.E.2d 355, 365 (2002).  Therefore, husband did not

preserve any objection to this particular aspect of the court's

ruling and may not argue error now before this Court.  See Rule

5A:18.

### B.  The "Assignment"

The parties agree the businesses were marital property

initially.  Therefore, they "may become separate property only

through a 'valid express agreement by the parties' . . . or as

provided in Code § 20-107.3(A)(3)(d)."[7]  McDavid v. McDavid, 19

Va. App. 406, 411, 451 S.E.2d 713, 716-17 (1994) (citing Wagner

v. Wagner, 4 Va. App. 397, 404, 358 S.E.2d 407, 410 (1987); Code

§ 20-155).  As subsection (A)(3)(d) does not apply to the facts

---

[6] Even if husband were correct, the evidence in this case
meets the burden of proof he asks us to apply.  See infra B(3)
(Intent).

[7] Subsection (A)(3)(d) discusses commingling of assets,
which is not argued here.

of this case, the issue here is whether the parties had a valid

express agreement regarding the businesses.

Wife had the burden to prove to the trial court that such

an agreement existed.  See id. at 411, 451 S.E.2d at 717.  She

met this burden by presenting the written "assignment" to the

trial court.  When a written marital agreement is presented, a

court applies "the same rules of formation, validity and

interpretation" used in contract law, Smith v. Smith, 3 Va. App.

510, 513, 351 S.E.2d 593, 595 (1986), except where specified by

the Code.  Compare, e.g., Code § 20-149 (premarital agreements

"shall be enforceable without consideration") with Sager v.

Basham, 241 Va. 227, 229-30, 401 S.E.2d 676, 677 (1991) (a valid

contract must be supported by some slight consideration).

1.  Marital Agreement under Code § 20-155

On appeal, husband does not contest the fact that a

contract was formed.  Rather, he argues the "assignment" was not

intended to convert marital property into wife's separate

property.  We disagree.

Husband argues the "assignment" was not signed as part of

separation or divorce negotiations and, therefore, is not a

marital agreement.  However, marital agreements are not limited

to actions taken in contemplation of divorce.

Marital agreements are permitted under Code § 20-155:

> Married persons may enter into agreements
> with each other for the purpose of settling
> the rights and obligations of either or both

-

of them, to the same extent, with the same effect, and subject to the same conditions, as provided in §§ 20-147 through 20-154 for agreements between prospective spouses, except that such marital agreements shall become effective immediately upon their execution.

Accordingly, marital agreements may address:

1. The rights and obligations of each of the parties in any of the property of either or both of them whenever and wherever acquired or located;

2. The right to buy, sell, use, transfer, exchange, abandon, lease, consume, expend, assign, create a security interest in, mortgage, encumber, dispose of, or otherwise manage and control property;

3. The disposition of property upon separation, marital dissolution, death, or the occurrence or nonoccurrence of any other event;

4. Spousal support;

5. The making of a will, trust, or other arrangement to carry out the provisions of the agreement;

6. The ownership rights in and disposition of the death benefit from a life insurance policy;

7. The choice of law governing the construction of the agreement; and

8. Any other matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty.

Code § 20-150.

"Courts are not allowed to write new words into a statute plain on its face." Flanary v. Milton, 263 Va. 20, 23, 556

S.E.2d 767, 769 (2002). Husband would have us read into Code §§ 20-155 and 20-150 a requirement that the agreement be made specifically in contemplation of divorce. While Code § 20-150(3) permits agreements in that context, subsection (3) does not modify the entirety of the section. Subsections (1), (2), and (8) do not limit marital agreements to contracts made in contemplation of divorce. Therefore, the Code allows marital agreements made outside the context of separation and divorce. Code § 20-155 permits these agreements generally, without restricting the context to divorce or separation proceedings, subject only to the limitations of Code §§ 20-147 through 20-154. See, e.g., McDavid, 19 Va. App. at 411-12, 451 S.E.2d at 717 (finding a deed of gift, executed before the parties contemplated divorce, transferred wife's marital rights to husband under Code § 20-155). Code § 20-150(1), (2), and (8) permit contracts that transfer "all of [husband's] right, title, and interest" in the parties' businesses to wife. Therefore, the "assignment" is a valid marital agreement under Code § 20-155.

2. "Arising from the Marital Relationship"

Husband argues the "assignment" did not address rights "arising from the marital relationship," therefore, it is not a marital agreement under Black v. Edwards, 248 Va. 90, 445 S.E.2d 107 (1994). He misinterprets this case.

-

Black involved a suit by third parties against the estate of decedent, for his revocation of a reciprocal will after the death of his wife, which withdrew the names of the third parties as beneficiaries of his will. Id. at 91-92, 445 S.E.2d at 108. The property interests of the decedent and his wife were not in question. Only the interests of third-party beneficiaries were at issue. The estate argued that an agreement on reciprocal wills must be in writing under Code § 20-155, and this agreement was oral. Id. at 93-94, 445 S.E.2d at 109.

The Supreme Court explained, "[W]e do not think that the legislature intended Code § 20-155 to require that contracts between spouses be in writing, while permitting other persons to make such contracts orally." Id. at 94, 445 S.E.2d at 110. The Court then held:

> [W]e are of [the] opinion that the emphasized portion of Code § 20-155 clearly limits its provisions to those contracts affecting those "rights and obligations" that arise from the marital relationship. Here, each spouse's contractual intent to benefit third parties after the death of both spouses did not affect the "rights and obligations" arising from the [decedent's and his wife's] marital relationship. Thus, we conclude that Code § 20-155 is inapplicable.

Id.

Husband claims, based on Black, "The parties' ownership of stock in the businesses at issue does not arise from their marital relationship; it is a fact outside the marital

-

relationship. Thus, an agreement to adjust that ownership is not a marital agreement." However, Black does not hold that only marital rights, i.e., the rights that develop exclusively from a marriage, such as spousal support and equitable distribution, are the only rights and obligations covered by Code § 20-155. Black simply stands for the proposition that marital agreements must deal with the rights and obligations between spouses, not third parties. Id.

The only rights we are asked to examine are the interests that arose because the parties were married.[8] Unlike Black, where the spouses' rights to the property were not in question, this case clearly involves the spouses' "'rights and obligations' that arise from the marital relationship." Id. The "assignment" was a marital contract under Code § 20-155.

### 3. Intent

Husband also argues the agreement did not transfer his marital property to wife as her separate property because he did not intend to transfer those interests. He bases this argument on both the language of the "assignment" and parole evidence of his intent.[9]

---

[8] Husband has never objected to the retitling of the stock and ownership interests, his removal as president of the businesses, nor the failure to include him in the operation of the businesses.

[9] Neither party objected to the use of parole evidence by the trial court. In fact, both parties suggested they wanted the judge to consider evidence outside the "assignment."

-

We review the terms of an agreement de novo. See Smith, 3 Va. App. at 513, 351 S.E.2d at 595 ("[W]e are not bound by the trial court's conclusions as to the construction of the disputed provisions.").

Virginia adheres to the "plain meaning" rule – courts examine the plain language of an agreement, going beyond the written contract only when its meaning is ambiguous. See Pysell v. Keck, 263 Va. 457, 460, 559 S.E.2d 677, 678-79 (2002); Douglas v. Hammett, 28 Va. App. 517, 524-25, 507 S.E.2d 98, 101 (1998); Tiffany v. Tiffany, 1 Va. App. 11, 15-16, 332 S.E.2d 796, 799 (1985). Courts shall not include or ignore words to change the plain meaning of the agreement. Southerland v. Estate of Southerland, 249 Va. 584, 590, 457 S.E.2d 375, 378 (1995).

The language of the "assignment" plainly gives wife "all of [husband's] right, title, and interest" in the businesses. (Emphasis added). The preamble of the agreement expresses husband's desire to "withdraw as an owner" in all the businesses. The contract was not intended to transfer only bare legal title, as husband suggests, but transferred "all" of his rights.

Husband argues marital rights were not included in "all" of the rights transferred by the agreement, because the "assignment" did not explicitly refer to those rights. He

-

compares the language of the "assignment" to the language used in the deed of gift in McDavid.

In McDavid, the wife transferred her interest in real estate to her husband "'in his own right as his separate and equitable estate as if he were an unmarried man . . . free from the control and marital rights of his present . . . spouse.'" 19 Va. App. at 411, 451 S.E.2d at 717 (ellipses in original). The Court found this language transferred wife's marital rights in the real estate to her husband.  Id. at 411-12, 451 S.E.2d at 717.

While the "assignment" does not include the phrase, "marital rights," as used in McDavid, it does transfer "all right, title, and interest" to the businesses.  We must "'give effect to all of the language of a contract.'"  Tiffany, 1 Va. App. at 16, 332 S.E.2d at 799 (quoting Berry v. Klinger, 225 Va. 201, 208, 300 S.E.2d 792, 796 (1983)).  See also Winn v. Aleda Constr. Co., 227 Va. 304, 307, 315 S.E.2d 193, 195 (1984) ("[T]here is a presumption that the parties have not used words aimlessly.").

"All" generally means the entirety.  See Random House Webster's College Dictionary 34 (1997).  As the trial court indicated, the "assignment" did not include a reservation of any right.  Instead, the "assignment" effectively eliminated all connection between husband and the ownership and control of the businesses.  To find the "assignment" transferred only legal

-

title would require that we ignore its use of the word, "all," which modifies "right" and "interest."  The express and specific language of the agreement transferred <u>all</u> husband's rights and interests, which logically includes his marital rights, to wife.

Even if the document was ambiguous, the context in which the agreement was reached would clarify the meaning of "all of his right, title, and interest."  As the trial court found:

> [Husband] basically decided to pack it in and leave.  Based on the evidence, he left this letter, and he says in the letter, I will be leaving Harrisonburg and not returning.  And then as for the proceeds of the Shenk Honda or [the Market], Grandma's Pantry, et cetera, I leave it all.  The clear implication that is I leave it all to you.
>
> \*       \*       \*       \*       \*       \*       \*
>
> And it is inconceivable to me that if his intent was not to assign to her everything and make it her separate property that that would have been specifically set forth in either the letter he left her or in the document that he signed on March 18, [sic] 1999.

The evidence supports this factual finding by the trial court. <u>See, e.g.</u>, <u>Welshman v. Commonwealth</u>, 28 Va. App. 20, 36-37, 502 S.E.2d 122, 130 (1998) (<u>en</u> <u>banc</u>) (explaining a trial court determines factually whether a defendant intended to distribute cocaine and that finding "is binding on appeal unless plainly wrong").

Husband relinquished all interest in the businesses to wife in a letter.  The letter clearly expressed husband's intention

-

to permanently leave his wife, children, and the businesses.  He wrote, "I wish for you happiness, fulfillment, contentment, and to finally have a peace about who you are."  He indicated he felt "like a hostage" with the children.  He said, "As for the proceeds [of the businesses] . . . I leave it all."  The "assignment" was signed eight months after husband left town. The trial court could properly infer from this letter, coupled with the assignment, that husband intended to divest himself of the marital relationship and the assets of that relationship.

Although husband was actively involved in running the businesses prior to leaving, he did nothing to help wife with the businesses after he wrote the letter and left town.[10]  When he relinquished his rights to the businesses, he knew they had significant debt and were in danger of foreclosure.

This Court has explained intent in the context of Code § 20-107.3[11]:

> Where the facts clearly and unambiguously
> support the conclusion that one of the
> parties has relinquished all right and
> interest in marital property and has
> transferred those rights unconditionally to
> the other, to the exclusion of the donor's

---

[10] Husband testified he sent money for business debts and helped with some maintenance at the Market.  However, wife testified he did nothing to help.  This evidence must be viewed in the light most favorable to wife, the party prevailing below. See Gilman v. Gilman, 32 Va. App. 104, 115, 526 S.E.2d 763, 768 (2000).

[11] Code § 20-107.3 discusses determinations of separate and marital property in the context of equitable distribution.

> continuing claim upon the property as a
> marital asset pursuant to Code § 20-107.3, a
> separate property right will be found to
> exist.

Kelln, 30 Va. App. at 122-23, 515 S.E.2d at 793-94 (discussing interspousal gifts).

Husband transferred all his right and interest in the businesses, without reservation, both in the letter and in the "assignment." He made no continuing claims on the property and exercised no control, at least until the parties began discussing a property settlement and husband discovered the businesses were beginning to make a profit, nine months after the "assignment" was executed.

From the evidence, the trial court could conclude husband abandoned his family and his businesses, at a time when the businesses had no value. Indeed, the businesses had a negative cash flow, foreclosure was imminent, and the debts exceeded the value of the businesses. Only through the work of wife and her father-in-law did the businesses become profitable. Now, husband appears to claim the benefit of his wife's and father's labors. We find the businesses became wife's separate property when the parties entered into the marital agreement.

## C. Unconscionability

Husband argues, if the "assignment" converted marital property to wife's separate property, then it is unconscionable under Code § 20-151(A)(2). He contends (1) no consideration was

-

exchanged, (2) husband's responsibility for the business debts continued, and (3) wife's receipt of 100% of the marital assets is facially unconscionable. We note initially that he must prove unconscionability by "clear and convincing evidence," with the evidence viewed in the light most favorable to wife, the party prevailing below. Derby v. Derby, 8 Va. App. 19, 26, 378 S.E.2d 74, 77 (1989).

## 1. Consideration

Husband concedes a marital agreement is enforceable without consideration. Husband claims, however, while an agreement might be enforceable, in this context, the lack of consideration makes the agreement unconscionable. We disagree.

Code § 20-149 clearly states, "Such agreements [premarital and marital agreements] shall be enforceable without consideration." An agreement cannot be both unconscionable and enforceable. While Code § 20-151 allows courts to find some marital agreements unconscionable, lack of consideration without deception or bad faith is not a factor in making such a finding. See, e.g., Derby, 8 Va. App. at 28-33, 378 S.E.2d at 78-81.

Husband was an "experienced businessman." He does not claim he was unaware of the condition of the businesses or of their potential for growth. On appeal, neither party suggests this case involves a failure to disclose information, trickery, or bad faith. Assuming no consideration was exchanged, the agreement is still enforceable.

-

## 2. Continuing Debt

Husband also argues the agreement is unconscionable because "the assignment does not charge the wife with all of the businesses' debts." We disagree.

The "assignment" included the following provision: "[Husband] understands and acknowledges that he will remain personally liable, to <u>the extent of his current personal liability</u>, on any and all debts of the [businesses] and any guaranties or endorsements that are currently in place." (Emphasis added.) Assuming husband is correct that he remained liable on the businesses' debts, we would not find the agreement unconscionable. The courts will not second-guess the wisdom of contractual provisions. See <u>Rogers v. Yourshaw</u>, 18 Va. App. 816, 820, 448 S.E.2d 884, 886 (1994).

While potentially unwise, husband signed the agreement, which clearly included the statement that he retained some liability for current debt. He does not argue the statement was hidden or ambiguous. Additionally, husband does not suggest that he ever had to make any payments on any business, as opposed to personal, debts. He does not argue any actual detriment from this provision. In fact, wife agreed she would "use her best efforts to continue the business operations . . . [and] to pay the debts, liabilities, and obligations" of the businesses, which reduced husband's exposure on the debts and eliminated his responsibility to work in the businesses.

-

Retention of liability for his existing debts is not unconscionable in this context.

### 3. Facial Unconscionability

Finally, husband argues the agreement is unconscionable because it gives all of the parties' significant property to wife, leaving husband with nothing.[12] He claims Derby controls this case.

In Derby, this Court found, "[T]he gross disparity in the value of the property each received under the separation agreement [was] shocking in that Sandra Derby becomes sole owner of the bulk of the parties' marital property valued at $260,000 . . . ." 8 Va. App. at 30, 378 S.E.2d at 80 (emphasis added). The Court also noted that the agreement included a waiver of Mr. Derby's "rights to spousal support while Sandra Derby retained hers" and that evidence proved "concealment, misrepresentation, and undue advantage on the part of Mrs. Derby as well as emotional weakness on the part of Mr. Derby." Id. at 31, 378 S.E.2d at 80. None of these factors exists in the case before us.

---

[12] The parties did own other real estate, including the marital home, which wife retained when husband left. The status of these properties as well as the parties' personal property is not an issue before us.

Husband does not allege concealment, misrepresentation, undue advantage, or emotional weakness.[13]  He argues only that wife received all of the marital assets.  However, he ignores the fact that, at the time the "assignment" was signed, the businesses were significantly in debt and not making a profit.  The value of the real estate and building was less than the amount of the debt.  Wife actually became the owner of businesses that had no value and were saddled with debt.  She also took over all of husband's responsibility for operating the businesses, significantly increasing her working hours.[14]  Husband had no more responsibility to improve the viability of the businesses.  He was free to leave the state, travel, and seek other employment, which he did.  When the parties signed the agreement, wife received all the responsibility as well as all the ownership in a failing business.  We do not find such an agreement is unconscionable.

---

[13] Under the rule of law established in Drewry v. Drewry, 8 Va. App. 460, 472-73, 383 S.E.2d 12, 18 (1989), and Pelfrey v. Pelfrey, 25 Va. App. 239, 244-45, 487 S.E.2d 281, 284 (1997), appellant must prove both (1) a gross disparity existed in the division of assets and (2) overreaching or oppressive influences created an unfair process.  Husband alleges only the first prong of this test.  Wife, however, does not challenge husband's unconscionability argument on his failure to allege overreaching.

[14] Husband's father still owned part of the Market and was involved in the operation of the business.

-

The parties entered into a marital agreement.  That agreement is valid.  For the reasons stated above, we affirm the trial court's ruling.

Affirmed.