COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Felton, Judges Elder and Beales
Argued at Chesapeake, Virginia


RABHA NAMROURI CHAPLAIN
                                                  MEMORANDUM OPINION[*] BY
v.        Record No. 1301-10-1              JUDGE LARRY G. ELDER
                                                      JANUARY 18, 2011
BILLY W. CHAPLAIN


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Frederick B. Lowe, Judge

Mark R. Baumgartner (A. Bartlett Keil; Pender & Coward, P.C.,
on briefs), for appellant.

James A. Evans (Evans & Bryant, PLC, on brief), for appellee.


In this appeal following remand, see Chaplain v. Chaplain, 54 Va. App. 762, 682 S.E.2d

108 (2009), Rabha Namrouri Chaplain (wife) appeals from a ruling that her premarital agreement

with Billy W. Chaplain (husband) is enforceable under the Premarital Agreement Act, Code

§§ 20-147 to -155.  She contends the evidence does not support the trial court's determinations

(1) that the agreement is not unconscionable and (2) that she voluntarily executed the agreement.

We hold the evidence, viewed in the light most favorable to husband, as required by the standard

of review, supports the trial court's determinations.  Thus, we affirm its conclusion that the

parties' agreement is enforceable.

I.

Virginia's Premarital Agreement Act (the Act) provides in relevant part as follows:

A.  A premarital agreement is not enforceable if the person
against whom enforcement is sought proves that:

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

1.  That person did not execute the agreement voluntarily; or

2.  The agreement was unconscionable when it was executed and, before execution of the agreement, that person (i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party; and (ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided.

Code § 20-151(A). As we held in the previous appeal, husband did not provide wife with the requisite property disclosure, and wife did not waive her right to that disclosure in the manner provided for by the statute, before execution of the premarital agreement. Chaplain, 54 Va. App. at 776, 682 S.E.2d at 115. Thus, in the instant appeal, the trial court's ruling that the premarital agreement was enforceable was erroneous if the evidence proved either that the agreement was unconscionable when wife executed it or that she did not execute it voluntarily.

A. UNCONSCIONABILITY OF THE AGREEMENT

Whether a premarital agreement is unconscionable is to be determined as of the time of its execution, and the party alleging unconscionability bears the burden of proof. Code § 20-151(A)(2); see also Rogers v. Yourshaw, 18 Va. App. 816, 820, 448 S.E.2d 884, 886 (1994) (pre-Act agreement).

> While the question of unconscionability is a matter of law, the underlying facts must be determined by the fact finder, and on appeal we determine whether there is sufficient evidence to support the factual findings. If there is credible evidence in the record supporting the factual findings made by the trier of fact, we are bound by those findings regardless of whether there is evidence that may support a contrary finding.

Galloway v. Galloway, 47 Va. App. 83, 92, 622 S.E.2d 267, 271 (2005) (postnuptial agreement). "Recitations in the agreement shall create a prima facie presumption that they are factually correct." Code § 20-151(B).

> Historically, a bargain was unconscionable in an action at law if it was "'such as no man in his senses and not under delusion would

make on the one hand, and as no honest and fair man would accept on the other.'" If inadequacy of price or inequality in value are the only indicia of unconscionability, the case must be extreme to justify equitable relief. A person may legally agree to make a partial gift of his or her property or may legally make a bad bargain.

Derby v. Derby, 8 Va. App. 19, 28, 378 S.E.2d 74, 78-79 (1989) (quoting Restatement (Second) of Contracts § 208 cmt. b (1981) (quoting Hume v. United States, 132 U.S. 406, 411 (1889))) (citation omitted).

Here, the recitations in the agreement state "each of the parties warrants, represents, covenants and guarantees . . . that this agreement is not unconscionable."[1] Therefore, the presumption is that the agreement is not unconscionable, Code § 20-151(B), and wife "had the burden at trial to prove by clear and convincing evidence the grounds alleged to void or rescind the agreement," Drewry v. Drewry, 8 Va. App. 460, 463, 383 S.E.2d 12, 12 (1989).

In a typical case alleging unconscionability of such an agreement, the court must consider (1) whether "a gross disparity existed in the division of assets and [(2)] [whether the evidence shows] overreaching or oppressive influences." Galloway, 47 Va. App. at 92, 622 S.E.2d at 271; see also Shenk v. Shenk, 39 Va. App. 161, 179 n.13, 571 S.E.2d 896, 905 n.13 (2002). "[G]ross disparity in the value exchanged is a significant factor in determining whether oppressive influences affected the agreement to the extent that the process was unfair and the terms of the resultant agreement unconscionable." Derby, 8 Va. App. at 28, 378 S.E.2d at 79, quoted with

---

[1] We reject the portion of the agreement stating the parties' "recitations herein are factually and conclusively irrebuttably correct and not just *prima facie* or rebuttably correct," as this statement conflicts with the Act's provision that "[r]ecitations in the agreement shall create a prima facie presumption that they are factually correct." Code § 20-151(B); see Hagy v. Commonwealth, 35 Va. App. 152, 160, 543 S.E.2d 614, 618 (2001) (equating a *prima facie* presumption with a rebuttable one). To hold otherwise would place the validity of the premarital agreement beyond judicial review, a result clearly not contemplated by the statutory scheme.

approval in Chaplain, 54 Va. App. at 773, 682 S.E.2d at 113. Proof of "overreaching or oppressive influences" may be established in either of two ways:

> "When the accompanying incidents are inequitable and show [(a)] bad faith, such as concealments, misrepresentations, undue advantage, [or] oppression *on the part of the one who obtains the benefit*, or [(b)] ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, *on the part of the other*, these circumstances, combined with [evidence of the first prong,] inadequacy of price, may easily induce a court to grant relief, defensive or affirmative."

Derby, 8 Va. App. at 28-29, 378 S.E.2d at 79 (quoting Pomeroy, Equity Jurisprudence § 928 (5th ed. 1941)) (emphases added). "Parties engaged to be married," like married parties, "are not dealing at arm's length. They have a special relationship of trust and confidence." Carpenter v. Carpenter, 19 Va. App. 147, 152, 449 S.E.2d 502, 504 (1994) (pre-Act agreement). "'Particularly when the negotiation is between the parties rather than between their lawyers, the relationship creates a situation ripe for subtle overreaching . . . .'" Sims v. Sims, 55 Va. App. 340, 350, 685 S.E.2d 869, 874 (2009) (quoting Derby, 8 Va. App. at 29, 378 S.E.2d at 79).

Here, because wife attempts to rebut the presumption of conscionability with evidence that she could not speak or read English with any proficiency and, therefore, did not know the contents of the "marriage paper" she signed, we begin our analysis of Derby's two-part "oppressive influences" test by examining the sufficiency of the evidence to prove the second part of that test—whether "'ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like'" impacted the party claiming unconscionability. Derby, 8 Va. App. at 28, 378 S.E.2d at 79 (quoting Pomeroy, supra, § 928). The evidence, viewed in the light most favorable to husband, establishes that when wife entered into the premarital agreement, she spoke and understood English very well, although her spoken English may have been somewhat "broken." Prior to marrying husband, she read English menus and newspapers and wrote various business letters in English for husband to send to the tenants of his apartment

- 4 -

building. The evidence also supported a finding that wife was able to converse without a translator or any other language assistance, engaging in coherent conversations in English on topics such as medicine, pain relief, and amniocentesis.[2] Finally, the evidence proved she stated that, if husband ever sought to divorce her, she would lie about her ability to understand English and the contents of the agreement so she could attempt to have it invalidated.

The evidence also supports a finding that wife failed to prove intellectual or physical limitations or inappropriate pecuniary factors constituted oppressive influences rendering her endorsement of the agreement unconscionable. It is undisputed that wife came to the United States from Morocco to visit her brother during her vacation, for which she held a round-trip airline ticket, and that she met husband only after she arrived in the United States. Compare In re Marriage of Shirilla, 89 P.3d 1, 3-4 (Mont. 2004) (involving a woman who met a man via the internet and came from Russia to the United States on "a fiancée visa," at which time the man presented her with a prenuptial agreement). It was also undisputed that wife was approximately forty years old, had worked as a secretary to "the boss" of a successful construction company in Morocco for fifteen to eighteen years prior to coming to the United States and, as a result, that she was "pretty important in th[e] company herself." Wife had received raises over the years in the course of that employment and had a savings account. The evidence, viewed in the light most favorable to husband, also established wife was college educated and that, upon arriving in the United States, wife helped husband with some of his business transactions, including preparing receipts for his tenants, writing notification letters to his tenants and typing various other documents. Thus, the evidence established wife had the intellectual capacity to understand

---

[2] Because we conclude the evidence establishes wife understood English and that a language barrier did not prevent her from comprehending the terms of the premarital agreement, we need not consider husband's argument that wife would nevertheless have been bound by it even if the evidence had established she was not able to read it or understand its terms.

the impact of the prenuptial agreement and failed to establish she could not support herself in the United States or Morocco.

The evidence also failed to establish overreaching or oppressive influences under the first prong of the Derby test, i.e., it showed no bad faith such as concealments, misrepresentations, undue advantage or oppression on the part of husband. Although husband did not fully disclose his financial condition to wife prior to execution of the agreement, this fact alone does not prove bad faith, overreaching or oppressive influences. See, e.g., Code § 20-151(A)(2) (providing a premarital agreement is unenforceable if a spouse proves *both* that the agreement was "unconscionable when . . . executed" *and* that, "before execution of the agreement, that person (i) was not provided a fair and reasonable disclosure of the property or financial obligations of the other party, and (ii) did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided"). Although wife claimed husband told her he was "a poor man" and she may not have known his precise net worth, which was about $20 million, she knew, and husband made no effort to hide from her, that he owned a 50-unit apartment building, a 150-acre farm, and several other properties. Cf. Unif. Premarital Agreement Act § 6 (1983), 9C U.L.A. 39, 48 (2001) (to establish unconscionability of a premarital agreement, requiring proof not only that the party failed to provide a fair and reasonable disclosure of property and lack of written waiver but also that he or she "did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party"). Husband admitted telling wife "[he] didn't have the money much," but he testified he did so in the context of stating that he "had a lot of stuff tied up in different businesses," i.e., that he was cash poor, and no evidence established this representation was untrue.

Husband's evidence further supported a finding that he did not want to remarry because of the impact his prior divorce had had on his financial condition. Husband finally told wife he would accede to her repeated requests to marry if she would sign a prenuptial agreement. Husband explained to her that under such an agreement, he would keep the property and other assets he owned at the time of the marriage, and she would keep those that were hers. Although wife initially balked at this request, she eventually acceded to it, telling him she and her family had property and other assets in Morocco that might exceed his and that she did not want anything from him other than to marry him.

The evidence also supported a finding that after husband asked his attorney, Grover Wright, to draw up such an agreement, husband repeatedly told wife she could go to Wright's office to review the agreement and that, after some period of time, they went together to look it over. Husband testified Wright "explained [the agreement] to [wife]" on that occasion[3] and that wife "took a copy home with her" and "studied it." When he and wife returned to Wright's office on a later date, August 13, 1997, Wright explained to wife the agreement meant that "if [the parties] separated, . . . she wouldn't get anything." Wright also brought in another attorney from an adjacent law office, John Richardson. Wright instructed him to "[r]ead everything to her . . . and explain it to her, and [Richardson] did, and [wife] said she understood it."[4] Husband also testified that Wright's secretary, Dorothy Swanson, read the agreement to wife, as well, going over it with her page by page. The parties signed the agreement; their signatures were

---

[3] The trial court was entitled to reject as inaccurate the testimony of husband's attorney, Grover Wright, presented by joint stipulation, that "he did not explain, advise[,] counsel or otherwise discuss the document with [wife]." See, e.g., Galloway, 47 Va. App. at 92, 622 S.E.2d at 271.

[4] Again, the trial court was entitled to reject as inaccurate or distinguish the testimony of attorney John Richardson, presented by joint stipulation, that he served as a notary public to wife's signature but that "he made no inquiry as to her understanding of the nature of the document or of its content." See supra note 3.

witnessed and notarized; and each received a copy of the agreement. This evidence supports a finding that wife knew the contents of the agreement before she signed it and had ample opportunity to consult with counsel of her own if she had so desired. Thus, wife failed to establish overreaching under this prong of the Derby test.

The evidence also failed to establish a gross disparity in assets. It is undisputed that husband had significant assets, but he testified wife told him that she and her family had similar holdings in Morocco and that the value of her family's assets might exceed his. Although wife testified to the contrary in the circuit court, the trial court was entitled to reject her testimony and to conclude what husband said she told him was the truth. Alternatively, there was no gross disparity in assets because at the time the parties executed the agreement, they were not yet married, no marital property yet existed, and they merely agreed to retain their respective separate assets as separate property in the event that they married and later divorced.

Even if the evidence established a gross disparity in assets, the trial court was entitled to conclude the agreement was not unconscionable because the evidence did not establish overreaching by husband or oppressive influences on wife. Husband's evidence supported a finding, to the contrary, that he was honest and above-board with wife, who married him in order to obtain citizenship and his money and planned to lie about her understanding of the premarital agreement if he ever sought to divorce her.

B. VOLUNTARINESS OF WIFE'S EXECUTION OF THE AGREEMENT

Although the evidence supports the conclusion that the agreement was not unconscionable, the agreement nevertheless was not enforceable against wife if she did not execute it voluntarily. Code § 20-151(A)(1).

The party disputing the enforceability of a premarital agreement bears the burden of proving she did not execute it voluntarily. Code § 20-151(A)(1). Voluntariness "is a question of

- 8 -

fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973); see Rogers, 18 Va. App. at 823, 448 S.E.2d at 888 (pre-Act agreement). As we have concluded in another context, "[t]he term 'voluntary' connotes "'[u]nconstrained by interference; unimpelled by another's influence; spontaneous; . . . [r]esulting from free choice.'"" Shuler v. Va. Emp. Comm'n, 9 Va. App. 147, 150-51, 384 S.E.2d 122, 124 (1989) (quoting Barnes v. Singer Co., 376 S.E.2d 756, 758 (N.C. 1989) (quoting Black's Law Dictionary 1413 (5th ed. 1979))); see In re Marriage of Bonds, 5 P.3d 815, 823 (Cal. 2000). Thus, an action taken under coercion or duress or without capacity or "'knowledge of essential facts'" is not voluntary. Bonds, 5 P.3d at 823-25 (quoting Black's Law Dictionary 1575 (6th ed. 1990)); cf. Schneckloth, 412 U.S. at 227 (holding in the criminal consent-to-search context that a permission to search that is "the product of duress or coercion, express or implied," is not voluntary).

Factors relevant to assessing whether a prospective spouse's execution of a premarital agreement was voluntary include:

> the coercion that may arise from the proximity of the execution of the agreement to the wedding, or from surprise in the presentation of the agreement; the presence or absence of independent counsel or of an opportunity to consult independent counsel; inequality of bargaining power—in some cases indicated by the relative age and sophistication of the parties; whether there was full disclosure of assets; and the parties' understanding of the rights being waived under the agreement or at least their awareness of the intent of the agreement.

Bonds, 5 P.3d at 824-25 (holding that the voluntariness of a premarital agreement executed without independent counsel should not be scrutinized to the same extent as in a criminal law setting).

The evidence, viewed in the light most favorable to husband, supports the trial court's finding that wife executed the premarital agreement voluntarily. As discussed, supra, in

Part I.A., the evidence supported a finding that wife had a sufficient grasp of English such that no language barrier prevented her from communicating with husband or from reading and understanding the agreement. Further, although husband was a successful businessman more than twenty-five years older than wife when they signed the agreement, wife was forty years old, college educated, and financially independent. Wife had come to the United States on a tourist visa with a round trip airline ticket, during a vacation from her job, to visit her brother and did not know husband at the time.

The evidence, viewed in the light most favorable to husband, also established that after wife met husband, she learned of his substantial real estate holdings and that it was she, rather than husband, who proposed marriage. Husband said he was "through with marriages" and did not want to get married because of the way his marriage to his first wife had ended. Despite husband's response, wife proposed to him on numerous additional occasions.[5]

Husband eventually told wife he would marry her if she would sign a premarital agreement providing "what I have is mine and what you've got is yours." Wife initially refused to sign such an agreement but later told him, "go get [a premarital agreement] made up, . . . I don't want anything you got. All I want to do is marry you." Wife also told husband she had a lot of property and money back in Morocco, was "well off" and "didn't need anything [he] had."

After the premarital agreement was prepared in late June 1997, husband told wife to go "read it and decide if she wanted to get married." They went together to the attorney's office,

_____

[5] Although wife's immigration status might have been relevant to this assessment, see, e.g., Friezo v. Friezo, 914 A.2d 533, 554-55 (Conn. 2007) (noting the evidence showed that if the wife desired more time to review the prenuptial agreement, the wedding could have been postponed without jeopardizing her immigration status), wife bore the burden of proving she did not execute the agreement voluntarily, and other than evidence that she came to the United States on a tourist visa and wished to marry in order to be allowed to remain, she has not cited any evidence in the record indicating her immigration status was a factor in determining whether she executed the agreement voluntarily.

where husband's attorney explained the contents of the agreement to wife. Wife "took a copy home with her" and "studied it." The parties returned to the attorney's office on a second occasion, August 13, 1997, at which time an attorney from a neighboring law firm came to Wright's office, read everything to wife and explained it to her. The attorney asked wife if she wished to add anything to the agreement, and wife responded that she did not. Husband testified wife spent "at least an hour reading [the agreement] over" that day and said she understood it before she signed. See Rogers, 18 Va. App. at 823, 448 S.E.2d at 888 (holding the agreement at issue was executed voluntarily where the wife, a law student when she signed the agreement, "was afforded the *opportunity* to obtain independent legal counsel but voluntarily declined to do so and signed the agreement containing a provision waiving consultation with counsel for both parties" (emphasis added)). The parties were married approximately three weeks later by a justice of the peace in a small civil ceremony attended by only two of husband's relatives. Thus, nothing in the record indicates any sort of time pressure coerced wife into signing the agreement on August 13, 1997, or prevented her from obtaining additional legal advice prior to signing if she had so desired it. See Friezo v. Friezo, 914 A.2d 533, 554-55 (Conn. 2007) (holding a party has a responsibility to delay the signing of an agreement if he or she does not understand it and that although surprising a party with a prenuptial agreement the day before a scheduled wedding could result in precluding the party, for all practical purposes, from obtaining the advice of counsel, that coercion does not exist where additional review would require delay of a small wedding not involving extensive planning such that it might easily be rescheduled if necessary).

In sum, the evidence supports the trial court's finding that wife entered into the premarital agreement knowingly, intelligently, and voluntarily. See Sailer v. Sailer, 764 N.W.2d 445, 453 (N.D. 2009) (holding execution of document was voluntary where prospective wife "had an opportunity to examine its contents well in advance of its execution," was "aware of the

- 11 -

disparity in the parties' resources at the time of execution," and nothing "establishe[d] any undue pressure to sign the document other than her desire to marry and to have [her prospective husband] 'trust' her").

## II.

For these reasons, we hold the evidence supports the trial court's determinations that the parties' premarital agreement was not unconscionable and that wife executed it knowingly and voluntarily. Thus, we affirm its conclusion that the agreement is enforceable.

Affirmed.