COURT OF APPEALS OF VIRGINIA


Present:  Judges Frank, Humphreys and McClanahan


TERRY ALAN JACOBSEN

                                                                    OPINION BY
v.         Record No. 2966-02-1            JUDGE ELIZABETH A. McCLANAHAN
                                                                    OCTOBER 7, 2003
JACQUELINE ELIZABETH JACOBSEN


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Robert B. Cromwell, Jr., Judge

(Steven K. Whitaker; Steven K. Whitaker, P.C., on brief), for
appellant.  Appellant submitting on brief.

(Steven P. Letourneau; John D. Hooker, Jr., & Associates, P.C., on
brief), for appellee.  Appellee submitting on brief.


Terry Alan Jacobsen (husband) appeals from a final decree of divorce incorporating a

separation agreement between him and Jacqueline Elizabeth Jacobsen (wife).  Husband contends

the trial court erred in (1) finding that husband and wife lived separate and apart without any

cohabitation and without interruption; (2) finding that the parties' reconciliation was a sham; and

(3) ratifying, affirming and incorporating the parties' stipulation and property settlement

agreement into the final divorce decree.  For the reasons that follow, we affirm the decision of

the trial court.

I.  Background

Husband and wife separated on January 3, 2000, when husband left wife for his former

wife, Lori.  On February 4, 2000, husband and wife entered into a written agreement, which,

among other provisions, gave wife the marital home.  The agreement also contained language

providing that, in the case of reconciliation between the parties, the agreement was null and void.[1]

In May 2000, husband returned to the marital home for a few days to attend a wedding. During that time, the parties discussed trying to reconcile. After the wedding, wife accompanied husband to Toledo, Ohio, where husband had relocated, and where Lori lived. The couple engaged in sexual intercourse while on the trip. After a week, wife returned to the marital home in Virginia Beach.

In July 2000, husband returned to Virginia Beach. From July 27, 2000, until September 28, 2000, husband intermittently stayed at the marital home. Wife admitted that she "was hoping" that husband would return to her. As a prerequisite to reconciliation, wife told husband that he must stop all contact with Lori, as wife was not amenable to reconciliation while husband maintained a relationship with his former wife.

During the July - September period, the parties spent a total of 29 days together. However, according to wife, husband never put his clothes back into the couple's bedroom, and never placed wife's wedding ring back on her finger, as she requested. Wife also stated, and husband denied, that husband did not help with household and home remodeling expenses.

Husband removed wife from his health insurance during the July - September attempted "reconciliation" period. During this time period, he also had business cards and a resumé printed showing his address to be Lori's Ohio home.

Husband stayed with Lori several times during the July - September time period, and, at one point, they went on a camping trip together. Husband admitted he "possibly" had intercourse "once" with Lori during that time. When husband was away from Lori, he had

---

[1] The agreement provided: "18. That in the event of a reconciliation between the parties this Agreement is unenforceable and null and void on [sic] all respects."

constant communications with her, either on the cell phone that Lori provided, or by e-mail. Husband also maintained a separate post office box, where he received correspondence from her.

After wife learned about the camping trip, and overheard husband telling Lori on the telephone that he loved her, wife said she realized she and husband would not be able to reconcile. On September 28, 2000, after an argument about husband's continued contact with Lori, husband left, and the parties separated permanently.

Wife filed a bill of complaint seeking divorce from husband on October 19, 2000. Pursuant to a decree of reference from the circuit court, the matter was referred to a commissioner in chancery ("commissioner"). The commissioner held an evidentiary proceeding on January 9, 2002.

Besides husband and wife, Jay Ross Laney ("Laney"), a friend of both parties, who had known husband for twenty-three years and wife for twelve years, testified before the commissioner. When asked if the parties had reconciled, Laney stated that the parties did not seem like husband and wife during the July - September period. He said they acted like "two people getting together, maybe trying to work something out or maybe trying to get something settled between them."

Laney corroborated husband's constant surreptitious communication with Lori. He stated that husband often talked on the cell phone with Lori while he was in the yard, the detached garage, or his car, while wife was in the house and unable to hear husband on the phone. Laney also testified that he and husband went on a business trip to Texas in September and that during that time he heard husband and Lori say over a speakerphone that they loved each other.

Laney stated that husband told him that his intention in reconciling with wife was only to get the house back. Laney testified that husband told him that "he was losing too much" by giving wife the house, that he intended to go back to Lori, that he was in Virginia Beach "to get

the house back," and that he did not intend to reconcile with wife. Laney recounted a conversation he had with husband, quoting husband as saying about wife, "F that woman, I don't care about her. All I want is my house." Laney also stated that husband offered to take care of him financially if husband got the house back.

Husband testified that Laney misconstrued the recounted conversation and that at the time he had made the statements, he was angry with his wife, and drunk. During cross-examination, husband admitted that it was possible to be reconciled with his wife and at the same time maintain a "girlfriend on the side."

The commissioner found from the evidence that the parties separated with the intent of terminating the marital relationship on January 3, 2000, and had lived separate and apart without cohabitation and without interruption. The commissioner also reported that the parties had a valid separation agreement, but that husband sought to avoid the agreement by the defense of reconciliation. The commissioner found, as a factual matter, that husband intended a sham reconciliation solely for the purpose of avoiding the agreement and not for the purpose of reconciliation and that husband's testimony was not credible when viewed in light of the testimony of the other witnesses and the evidence. The commissioner recommended that the agreement be incorporated into the divorce decree.

Husband filed exceptions to the commissioner's report, whereupon, on May 1, 2002, the circuit court heard argument with regard to whether the commissioner erred in finding the parties had lived separate and apart without cohabitation and without interruption since January 3, 2000, and whether the parties had reconciled. At the end of the hearing, the chancellor stated:

> Counsel, what I see before me and what a review of the file and the Commissioner's recommendation indicates to me is that this is a woman, Mrs. Jacobsen, who, perhaps, was motivated by a sincere desire to save her marriage; on the other hand, the evidence further indicates to me that Mr. Jacobsen, the husband, was motivated by a

> dollar sign represented by the equity in their residence — that he
> would like to have back the property.

The commissioner had the opportunity to listen to and observe the demeanor and tone of these parties as they testified. He found in this case that the husband intended a sham by his purported reconciliation with wife. The chancellor found that the evidence fully supported the commissioner's recommendations.

A final decree of divorce was entered on October 29, 2002, granting wife a divorce based on the grounds that the parties had lived separate and apart without cohabitation and without interruption for a period in excess of one year. The court further ratified, affirmed and incorporated the parties' February 4, 2000 separation agreement into the divorce decree.

## II. Analysis

This Court reviews "the evidence in the light most favorable to . . . the party prevailing below and grant[s] all reasonable inferences fairly deducible therefrom." Anderson v. Anderson, 29 Va. App. 673, 678, 514 S.E.2d 369, 372 (1999). Although the report of a commissioner in chancery does not carry the weight of a jury's verdict, see Code § 8.01-610, "'an appellate court must give due regard to the commissioner's ability, not shared by the chancellor, to see, hear, and evaluate the witnesses at first hand.'" Jarvis v. Tonkin, 238 Va. 115, 122, 380 S.E.2d 900, 904 (1989) (quoting Morris v. United Virginia Bank, 237 Va. 331, 337-38, 377 S.E.2d 611, 614 (1989)). "[I]ntent . . . is a question of fact to be determined from the evidence." Hall Bldg. Corp. v. Edwards, 142 Va. 209, 215, 128 S.E. 521, 523 (1925). "A commissioner's findings of fact which have been accepted by the trial court 'are presumed to be correct when reviewed on appeal and are to be given "great weight" by this Court. The findings will not be reversed on appeal unless plainly wrong.'" Barker v. Barker, 27 Va. App. 519, 531, 500 S.E.2d 240, 245-46 (1998) (quoting Rowe v. Rowe, 24 Va. App. 123, 140, 480 S.E.2d 760, 768 (1997)). See also Gilman v. Gilman, 32 Va. App. 104, 115, 526 S.E.2d 763, 768-69 (2000).

The public policy of the Commonwealth of Virginia is to encourage reconciliation of separated spouses and to preserve marriage. Coe v. Coe, 225 Va. 616, 303 S.E.2d 923 (1983). Reconciliation is the resumption of one's marital status by voluntarily living together, openly as husband and wife. Crenshaw v. Crenshaw, 12 Va. App. 1129, 408 S.E.2d 556 (1991). Reconciliation means more than simply cohabitation or the observance of civility; it comprehends a fresh start and *genuine* effort by both parties. Black's Law Dictionary 1272 (6th ed. 1990). Reconciliation must exhibit proof that the parties intend to live together as husband and wife and take up their respective roles in the relationship. In order that the evidence may satisfactorily establish such a reconciliation and resumption of cohabitation as will affect a separation agreement, it must ordinarily appear that the parties have established a home and that they live together in it in the normal relationship of husband and wife. Roberts v. Pace, 193 Va. 156, 159, 67 S.E.2d 844, 846 (1951).

> Mere casual cohabitation between the parties, after the separation, unaccompanied by resumption of normal married life together, or reasonable explanation for their failure so to do, is not sufficient to show a reconciliation or an agreement to live and cohabit together again on a permanent basis as husband and wife.

Id. "[C]ohabitation on a spasmodic basis . . . cannot be dignified into the status of a reconciliation in the sense demanded by society of a husband and wife living with each other on a permanent basis." Id. at 161, 67 S.E.2d at 846-47. Normal married life must be viewed in the context of a couple's married life together as it existed before they separated. The evidence in this case showed that husband cohabited with wife on a "spasmodic"[2] basis, totaling only twenty-nine days out of seventy (twelve in July, thirteen in August and just four in September), while continuing to engage in a romantic relationship with a woman outside the marriage. Given husband's continuing antics with his paramour, and wife's prerequisite to reconciliation that

---

[2] See Roberts, 193 Va. at 161, 67 S.E.2d at 846-47.

husband end that relationship, the parties cannot be said to have resumed normal married life together.

To prove reconciliation, the parties must resume matrimonial cohabitation with genuine intent. The party seeking to avoid an agreement based on a defense of reconciliation has the burden of proving that the reconciliation was genuine. The trial court found from the evidence that husband's statements and conduct proved that he did not intend to reconcile with wife. Husband asserts that the court should employ an objective intent test. He asserts that the parties' conduct in residing together and engaging in sexual intercourse with each other while holding themselves out as a married couple is enough to constitute a resumption of their marital relationship. He argues that, when the parties attempted to resume their relationship, their intent to reconcile should be presumed.[3] Resumption of sexual relations is only a factor in establishing a valid reconciliation. "[T]he parties also must resume the performance of marital duties while living together on a continuous basis." Petachenko v. Petachenko, 232 Va. 296, 299, 350 S.E.2d 600, 602 (1986). But, more than outward signs of reconciliation are also necessary. The parties must exhibit good faith. Good faith embodies honest purpose, and a fundamental expectation of fair and reasonable conduct. See Black's; *supra*, at 693; Michael P. Van Alstine, Of Textualism, Party Autonomy and Good Faith, 40 Wm. and Mary L. Rev. 1223 (1999). A valid reconciliation requires a mutual intention to resume the marital relationship absent bad faith. A husband who continues an affair with another woman, while purportedly engaging in reconciliation with his

---

[3] Husband contends that this case should be governed by Yeich v. Yeich, 11 Va. App. 509, 399 S.E.2d 170 (1990). That case held that when parties to a separation agreement thereafter reconcile, the agreement is terminated. The Yeich Court presumed "intent at the time of reconciliation to resume the marital relationship in all respects and intent to terminate any prior agreement restricting the rights of one of the spouses, unless the parties indicate otherwise at the time of the reconciliation." Id. at 514, 399 S.E.2d at 173. In contrast, in this case, the trial court did not have to presume intent because it found from the evidence that the parties did not, in fact, reconcile. While wife may have intended reconciliation, it was clear that husband did not have a genuine intent to do so. Therefore, the Yeich holding does not apply.

wife that is motivated by defeating a separation agreement, is exhibiting bad faith. Such bad faith behavior does not affect the validity of the separation agreement.

The evidence and exhibits in this case, in fact, support the commissioner's findings that husband intended a sham reconciliation solely for the purpose of avoiding the agreement, and not for the purpose of reconciliation. Husband told Laney several times that he was only back with wife so he could get the house. He continually called his paramour. He told his paramour he loved her in the presence of Laney. He went on a camping trip with the paramour, and visited her in Ohio. He admitted to "possibly" having sex with the paramour during the period of supposed reconciliation. He e-mailed the paramour. He dropped wife from his insurance. He had a resumé and business cards printed to include his paramour's address in Ohio rather than in Virginia where he was supposedly reconciled with his wife. The evidence in this case solidly supports the commissioner's findings regarding husband's intent, and will not be reversed.

The separation agreement that the parties entered into on February 4, 2000, which, *inter alia*, divided their joint property, including a provision that granted wife sole possession of the parties' residence is valid. The agreement specifically stated that in the event of reconciliation between the parties, the agreement was unenforceable and null and void in all aspects.

Husband sought to avoid the agreement by the defense of reconciliation. However, because the facts support the trial court's finding that the parties' purported reconciliation was a sham, the agreement remains valid. Each party has a duty to act in good faith, and when a party acts in bad faith, there cannot be a reconciliation. Husband clearly acted in bad faith and had no intent to resume his marriage to wife. There was no reconciliation. The trial court, therefore, did

not err in ratifying, affirming and incorporating the parties' stipulation and property settlement

agreement into the final divorce decree.  Finding no error, this Court affirms the decision of the trial court.

Affirmed.