COURT OF APPEALS OF VIRGINIA

Present:   Judges Athey, Chaney and Raphael
Argued at Richmond, Virginia

PUBLISHED

ERIC LISANN

v.      Record No. 0120-22-4

ELIZABETH LISANN

OPINION BY
JUDGE VERNIDA R. CHANEY
AUGUST 8, 2023

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
David Bernhard, Judge

Samuel A. Leven (The Baldwin Law Firm, LLC, on briefs), for
appellant.

Charles E. Powers (Alvin A. Lockerman, Jr.; Stiles Ewing Powers
PC, on brief), for appellee.


Following a bench trial in the Fairfax County Circuit Court (trial court), Eric Lisann

(husband) appeals from a final decree of divorce awarded to Elizabeth Lisann (wife) pursuant to

Code § 20-91(A)(9)(a) on the grounds that the parties lived separate and apart without

interruption and without cohabitation for over one year, since July 14, 2014.[1]  Husband contends

that the trial court erred in finding that the parties' separation date was in July 2014 rather than

December 2018—the date on which husband contends that he intended the separation to be

permanent.  This dispute about the separation date matters because it impacts the trial court's

equitable distribution and spousal support determinations.[2]  Husband argues that wife's

---

[1] The divorce decree also includes orders for child support and health care coverage for a
dependent child, which are uncontested in this appeal.  Additionally, in September 2020, the trial
court entered an agreed order incorporating the parties' custody and visitation settlement
agreement, which is not at issue in this appeal.

[2] The parties' separation determines numerous aspects of the trial court's equitable
distribution and spousal support determinations.  Code § 20-107.3(A)(2) provides that all

conciliatory statements and activities subsequent to July 14, 2014, show that wife did not

*continuously* maintain the intent to permanently separate after that date.  Husband further

contends that the trial court erred in relying on the July 2014 separation date when determining

its equitable distribution award and spousal support award.  Addressing husband's argument

requires this Court to resolve an issue of first impression in Virginia: whether a party who

intends to separate permanently at the commencement of the statutory separation period for a

no-fault divorce must—to preserve the separation date—*continuously maintain* the intent to

separate permanently throughout the separation period.[3]

For the following reasons, in addition to the reasons stated in this Court's separate

memorandum opinion in this appeal, this Court vacates the trial court's judgment in part,

reverses in part, affirms in part, and remands to the trial court for further proceedings and entry

---

property acquired prior to the parties' separation date is presumed to be marital property.  Code § 20-107.3(A)(4) provides that debts acquired by either party after the parties' separation date is separate debt.  Code § 20-107.3(A)(5) provides that debts acquired prior to the parties' separation date are marital unless proven to have been incurred for a separate purpose.  Code § 20-107.3(G)(1) uses the parties' separation date to calculate the marital share of the parties' retirement benefits.  In addition, the parties' separation date directly determines the duration of any reservation of spousal support awarded under Code § 20-107.1(D).  The parties' separation date also affects the trial court's spousal support award to the extent that it affects the spousal support equitable distribution factor under Code § 20-107.1(E)(8).

[3] In a separate memorandum opinion, this Court addressed husband's additional assignments of error and denied wife's request for appellate attorney fees.  *See Lisann v. Lisann*, No. 0120-22-4 (Va. Ct. App. Aug. 8, 2023).  In addition to the alleged errors addressed herein, husband also contends that the trial court erred in (1) awarding wife's home—acquired during the marriage—solely to wife, without first classifying it as marital, separate, or hybrid, and without valuing any marital part of the home, (2) classifying a specified annuity and a specified IRA as wife's separate property, (3) denying husband an award of spousal support, (4) failing to include in the final decree a reservation of husband's right to future spousal support, (5) excluding, as a discovery sanction, testimony of husband's witnesses relating to statutory equitable distribution factors and statutory spousal support factors, and (6) refusing to award attorney fees to husband.

of a modified divorce decree consistent with this Court's separate memorandum opinion in this appeal.

## BACKGROUND[4]

On appeal, the evidence and all reasonable inferences therefrom are viewed in the light most favorable to wife as the prevailing party in the trial court. *See Dixon v. Dixon*, 71 Va. App. 709, 713 n.1 (2020).

### A. *The Parties' Marriage*

Husband and wife married on May 8, 1993, and have two children born of the marriage. When the parties married in 1993, they resided in a condominium (Park Fairfax property) that wife purchased before they married. In September 1995, the parties moved out of the Park Fairfax property and wife began renting it out.

In 2000, the parties moved overseas to Paris, France, when wife—with husband's agreement—accepted a new position with her employer, the United States Department of Energy. Husband had initiated the parties' efforts to find employment in Paris—where he had family—by applying for a position in Paris with his employer, the United States Department of Justice. After wife accepted her new position in Paris, the parties learned that husband did not get the job in Paris that he had sought.

When the parties moved to Paris, husband left his position as a federal prosecutor and wife became the primary earning spouse. Thereafter, husband did not consistently maintain gainful employment. Nonetheless, wife did most of the cooking, cleaning, and shopping for the

---

[4] Because issues other than the parties' separation date are addressed in this Court's separate memorandum opinion in this appeal, the following background is limited to facts relevant to determining the parties' separation date.

family in addition to working full-time. While the parties were in Paris, they had a full-time nanny who cared for the children while wife was at work.

A year after the parties relocated to Paris, husband got a job at the Organization for Economic Co-operation and Development, which he held for one year. Subsequently, husband did part-time consulting work and eventually started his own law firm, which was not financially successful.

In August 2007, wife's employment required her to return to the United States. Wife and the parties' then preschool-aged son returned to the United States while husband and the parties' then school-aged daughter remained in Paris so the daughter could complete school. In December 2007, the parties' daughter returned to the United States, but husband stayed in Paris and did not return until late August 2008.

In March 2009, the parties moved to a rental home on Walden Drive in McLean, Virginia (Walden Drive rental home). The parties resided there until July 2014. Wife had expected husband to contribute his fair share to the $3,000 monthly rental payments, but he never did.

From March 2009 through July 2014, husband "bl[e]w off many job opportunities that came his way." R. 824. Husband periodically returned to France to teach law, perform client-related legal work, and make television appearances as a legal commentator. For over 11 months in 2011, husband maintained a separate household in Paris while wife remained in the United States, working full-time and caring for the parties' children.

In September 2012, wife decided to sell her Park Fairfax condominium property and to use the proceeds to purchase another home for her family's residence—which would eliminate the expense of monthly rent for the Walden Drive rental home. In October 2012, wife purchased a house on Daniel Lewis Lane in Vienna, Virginia (Daniel Lewis property), but husband refused to move there, claiming it was too small. Consequently, wife rented out the Daniel Lewis

property and the parties continued to reside in the Walden Drive rental home. At that time, husband paid no portion of the $3,000 monthly rent for the Walden Drive rental home.

## B. *The Parties' Separation*

By July 2014, wife had grown tired of financially supporting her deliberately underemployed husband, and wife separated from husband. On July 14, 2014 (July 2014 separation date), wife moved to the Daniel Lewis property and husband moved to a rented apartment. Wife moved to the Daniel Lewis property with the intent to permanently separate from and divorce husband.

Four months before the parties moved to separate residences, husband informed wife, through his attorney, that he "believe[d] that marital dissolution [wa]s inevitable." R. 2758. Wife testified at trial that since the July 2014 separation date, her intent to live separate and apart from husband continued and they lived separate and apart, without any cohabitation and without interruption. Before the July 2014 separation date, the parties ceased filing joint tax returns. After wife moved to the Daniel Lewis property, the parties continuously maintained separate residential and mailing addresses.

Although the parties moved to separate residences in July 2014, they maintained daily contact to provide for the welfare of their children. In addition to participating together in daily activities, the parties frequently had meals and attended functions together. Both parties had a key to the other's home. Between the July 2014 separation date and December 24, 2018, the separation date alleged by husband, the parties occasionally stayed overnight at each other's homes. Wife stayed overnight at husband's apartment when their son was uncomfortable staying there without her. Although the parties occasionally slept in the same bed after the July 2014 separation date, they did not have sexual relations. The last night husband stayed with wife at the Daniel Lewis property—and the last night they spent together—was Christmas Eve in 2018.

- 5 -

During the period from July 2014 through 2018, the parties also traveled extensively together, with visits to their daughter's college in Newport News, and trips to Connecticut, Maine, New Orleans, and Paris. But during this period, the parties never traveled together without one or both of their children. During these trips, the parties shared a room and a bed, but they never had any form of sexual relations.

Additionally—between the July 2014 separation date and December 2018—the parties celebrated several birthdays and holidays together. The parties also continued to exchange cards for various holidays and events, including wedding anniversary cards. Some of these cards expressed love and affection, and some used the parties' longtime pet nicknames for each other. In May 2018, the parties went out to dinner together in recognition of their 25th wedding anniversary and then returned to their separate homes.

After the parties ceased residing together, wife sent husband some conciliatory correspondence about their relationship and wife sporadically wore her wedding ring. On July 28, 2014, wife emailed husband stating that she "hope[s] it's not too late for us. I'm willing to do counseling." R. 1006. In August 2014, wife emailed husband stating, "We should work things out while we are together since the love is there. I need you. [S.L.] needs you. We are much - - so much stronger together." R. 1014. Wife noted in this email that "a lot of [husband's] stuff" was already at the Daniel Lewis property. R. 1015. On Christmas Eve, 2017, wife sent husband a text message stating, "We should be together as we were meant to be." R. 5166.

After July 2014, wife attempted to get counseling with husband. In 2017, wife asked husband if he would move to the Daniel Lewis property, but husband was not interested and did not move there. The parties never reconciled.

*C. Trial Court Findings and Rulings*

In October 2019, wife filed a complaint for divorce on the grounds of having lived separate and apart from husband since July 14, 2014. Husband filed an answer and counterclaim for divorce on the grounds of adultery and desertion. Husband alleged that the parties' separation date was December 24, 2018.

The eight-day trial commenced in August 2021 and was held across three months. The trial court found that the "parties have lived separate and apart without any cohabitation and without interruption for a period in excess of one year; to wit: since on or about July 14, 2014." R. 507. The trial court also found "[t]here is no hope or possibility of reconciliation between the parties." R. 507. The trial court "adjudged, ordered, and decreed":

> Wife is hereby granted a Divorce, *a vinculo matrimonii*, from Husband pursuant to Va. Code § 20-91(A)(9), based on the parties having lived separate and apart, continuously and uninterrupted, without any cohabitation, for more than one year, i.e. since July 14, 2014, and the bonds of matrimony are hereby forever dissolved.

R. 511.

## ANALYSIS

Husband contends that the trial court erred in finding that the parties' separation date was July 14, 2014, the day wife moved into the Daniel Lewis property and ceased residing with husband. Husband argues that wife's conciliatory actions and statements after the July 2014 separation date demonstrate wife's abandonment of any intent to separate permanently. Additionally, husband contends that after July 14, 2014, wife continued to attend family functions with husband and they continued traveling together for family events and vacations. Husband also contends that the physical separation between husband and wife was interrupted multiple times after July 2014 when they slept in the same bed when traveling or when staying overnight at each other's homes. After July 14, 2014, wife communicated to husband in writing

- 7 -

that she loved and needed him, that she hoped to reconcile, that she was willing to get counseling, and that she wanted husband to reside with her. Husband contends that these communications show that wife did not have a continuous intent to remain permanently separate and apart from husband, thereby undermining the trial court's finding that for purposes of Code § 20-91(A)(9), the parties separated on July 14, 2014. This Court holds that the trial court did not err in finding that wife satisfied the requirements of Code § 20-91(A)(9) in support of a divorce based on the July 2014 separation date. As a matter of first impression, we hold that a party seeking a no-fault divorce under Code § 20-91(A)(9) is not required to show that either party continuously maintained, throughout the statutory period, an intent to separate permanently. The statutory intent requirement under Code § 20-91(A)(9) is satisfied when, at the commencement of the statutory separation period, a party has the intent to separate permanently. Additionally, given our holding that the trial court did not err in finding that the parties' separation date was July 14, 2014, it follows that the trial court did not err in relying on the 2014 separation date when making its equitable distribution award and denying husband's request for spousal support.

### A. *Standard of Review*

"Determination of whether one or both of the parties formed the intent to remain permanently separate and apart is a question to be determined by the trial court as the fact finder." *Friedman v. Smith*, 68 Va. App. 529, 543 (2018); *see also Andrews v. Creacey*, 56 Va. App. 606, 619 (2010). This Court gives "great deference to the trial court's factual findings and view[s] the facts in the light most favorable to the prevailing party below." *Id.* (quoting *Blackson v. Blackson*, 40 Va. App. 507, 517 (2003) (internal quotation marks omitted)). "Under Code § 8.01-680, a factual determination cannot be reversed on appeal unless 'plainly wrong or without evidence to support it.'" *Congdon v. Congdon*, 40 Va. App. 255, 261 (2003) (quoting

- 8 -

Code § 8.01-680).  "The credibility of the witnesses and the weight accorded the evidence are matters solely for the [trial court as the] fact finder who has the opportunity to see and hear that evidence as it is presented."  *Budnick v. Budnick*, 42 Va. App. 823, 834 (2004) (quoting *Sandoval v. Commonwealth*, 20 Va. App. 133, 138 (1995)).

This Court "review[s] the trial court's statutory interpretations and legal conclusions *de novo*."  *Chaney v. Karabaic-Chaney*, 71 Va. App. 431, 434 (2020) (quoting *Navas v. Navas*, 43 Va. App. 484, 487 (2004)).  "A trial court is presumed to apply the law correctly."  *Shenk v. Shenk*, 39 Va. App. 161, 169 (2002).

B. *Wife's intent to permanently separate from husband on July 14, 2014, satisfies the intent requirement of Code § 20-91(A)(9).*

On July 14, 2014, after years of marital difficulties, wife moved into the Daniel Lewis property with the intent to permanently separate from husband, and husband subsequently moved into his own apartment.  The trial court found that "[t]he parties have lived separate and apart without any cohabitation and without interruption for a period in excess of one year . . . since on or about July 14, 2014."  R. 507.  The trial court granted wife a divorce "based on the parties having lived separate and apart, continuously and uninterrupted, without any cohabitation, for more than one year . . . since July 14, 2014."  R. 511.  In so ruling, the trial court necessarily found that wife had the intent to permanently separate from husband at the commencement of the separation period on July 14, 2014.  *See Hooker v. Hooker*, 215 Va. 415, 417 (1975) (requiring intent to separate permanently at the commencement of the separation period); *Starks v. Commonwealth*, 225 Va. 48, 54 (1983) (absent clear evidence to the contrary, trial court is presumed to apply the correct standard to the facts (citing *Yarborough v. Commonwealth*, 217 Va. 971, 978 (1977))).

Husband contends that even if wife intended the separation to be permanent when wife moved into the Daniel Lewis property on July 14, 2014, wife ceased to have that intention soon thereafter. To support this contention, husband relies on wife's occasional expressions of affection and wife's statement that she remained hopeful of a reconciliation. Wife testified that—notwithstanding her statements expressing a continuing affection for husband and a *hope* for reconciliation—she maintained her intent to permanently separate from husband after the July 2014 separation date. Although wife made statements indicating that she was receptive to reconciliation, and perhaps even hoped for it, the trial court's findings—supported by the evidence viewed in the light most favorable to wife—support the conclusion that wife and husband did not reconcile after the 2014 separation date.

Code § 20-91(A)(9)(a) does not include any express guidance on the intent required to satisfy the statutory separation period. Code § 20-91(A)(9)(a) provides:

> A divorce from the bond of matrimony may be decreed . . . [o]n the application of [husband or wife] if and when they have lived separate and apart without any cohabitation and without interruption for one year.

However, construing Code § 20-91(A)(9)(a), the Virginia Supreme Court has held that the separation must "be coupled with an intention on the part of at least one of the parties to live separate and apart permanently, and that this intention must be shown to have been present at the *beginning* of the uninterrupted [statutory separation period]." *Hooker*, 215 Va. at 417 (emphasis added). Although, in accordance with *Hooker*, the husband or wife must have the intent to separate permanently to *begin* the statutory separation period, *Hooker* does not address whether that intent must be maintained continuously subsequent to the commencement of the separation period. *See Andrews*, 56 Va. App. at 623 ("[T]he sole issue in *Hooker* was that the intent to separate must exist in order to establish the commencement of the separation period."). As

- 10 -

explained in *Hooker*, the reason for requiring that there be an intent to permanently separate at the *beginning* of the separation period is to avoid converting an extended separation required by circumstances unrelated to the marriage—such as work or other family obligations—into one that qualifies under the divorce statute, surprising either husband or wife. *See Hooker*, 215 Va. at 417. In *Hooker*, the husband's work overseas resulted in a physical separation, but the intent to separate permanently was not proven to exist until much later when husband asked his attorney to institute divorce proceedings. *Id.* at 416-17. The Court further explained that requiring an intent to permanently separate at the commencement of the separation period is needed to permit parties to benefit from "the salutary period of contemplation required by the statute during which the parties have an opportunity for reconciliation." *Id.* at 417.

Recognizing that *Hooker* imposes no intent requirement beyond the intent to permanently separate at the *commencement* of the statutory separation period, husband argues that this Court should extend the holding in *Hooker* to recognize a requirement to continuously maintain the intent to permanently separate throughout the separation period. Husband contends, citing *Andrews*, that this Court has "strongly implied" that the intent to separate permanently must be continuously maintained throughout the statutory separation period. Husband's reliance on *Andrews* is misplaced. *Andrews* concerned the application of a part of Code § 20-91(A)(9)(a) addressing the special case of a party who loses capacity during the separation period. Code § 20-91(A)(9)(a) provides, in part:

> [N]or shall it be a bar that either party has been adjudged insane, either before or after such separation has commenced, but at the expiration of one year or six months, whichever is applicable, from the commencement of such separation, the grounds for divorce shall be *deemed* to be complete . . . .

(Emphasis added). In *Andrews*, the husband was found to have had the requisite intent to commence the statutory separation period for divorce, but subsequently lost capacity to form

- 11 -

such an intent.  *Andrews*, 56 Va. App. at 623.  Because the husband lost capacity during the statutory separation period, the wife argued that the husband's co-guardians "did not prove that husband, even if he initially had such an intent to separate [permanently], continued to entertain that intent throughout the period of separation because of his incapacity."  *Id.*  This Court rejected the wife's argument, holding—under circumstances where a party loses capacity during the statutory separation period—"*Once one of the parties entertained an intent to separate*, and the parties have lived separate and apart without any cohabitation and without interruption for one year, the grounds of divorce are *complete*."  *Id.* (emphases added).  *Andrews* thus expressly rejects any implication that proof of intent, beyond the intent required to *commence* the statutory separation period, is required after a party loses capacity.  Although this Court went on to observe that it was "aware of no evidence that husband changed his mind or abandoned his intent to separate," *id.*, this statement merely recognized that the statutory separation period can be terminated in principle, upon, for example, actual reconciliation.  This Court did not hold or imply in *Andrews* that the one-year statutory separation period is terminated by mere conciliatory efforts or statements.  Indeed, as explained in *Hooker*, the purpose of the statutory separation period is to provide the parties with "an opportunity for reconciliation."  *Hooker*, 215 Va. at 417. That opportunity would seldom be pursued if efforts to explore reconciliation or making incidental conciliatory statements risked terminating the statutory separation period without any resolution of the parties' differences.

Moreover, in *Coe v. Coe*, 225 Va. 616 (1983), the Virginia Supreme Court—addressing the issue of adultery committed during the statutory separation period—further explained the purpose of the statutory separation period in terms that strongly suggest that conciliatory efforts do not interrupt the statutory separation period.  *See id.* at 620.  As explained in *Coe*:

- 12 -

> The statutorily mandated waiting period between the time
> separation occurs and the time a final decree of divorce can be
> granted is designed primarily *to give the parties an opportunity to
> reconcile and to determine if they desire the separation to be final*.

*Id.* (emphasis added). This Court will not impute to the General Assembly an intent to require

parties to *inconsistently* refrain from conciliatory efforts while considering reconciliation and

determining whether they want the separation to be permanent. *See Eastlack v. Commonwealth*,

282 Va. 120, 126 (2011) ("[S]tatutes are to be construed so as to avoid an absurd result.").

In further support of limiting the intent requirement under Code § 20-91(A)(9) to the

commencement of the separation, Code § 20-107.1(G)—defining the date of separation—

imposes a durational requirement on the separation, but not on the intent to separate

permanently. Code § 20-107.1(G) defines the "date of separation" for purposes of determining

spousal support as "the earliest date at which the parties are physically separated and at least one

party intends such separation to be permanent provided *the separation is continuous* thereafter

. . . ." (Emphasis added). *See Cuccinelli v. Rector & Visitors of Univ. of Va.*, 283 Va. 420, 425

(2012) (stating that courts have a "duty to interpret the several parts of a statute as a consistent

and harmonious whole so as to effectuate the legislative goal").

Husband contends that Code § 20-106(B)(5) *implies* that the General Assembly intends

that the requisite intent to permanently separate be maintained throughout the separation period.[5]

Code § 20-106(B)(5) provides that an affidavit supporting divorce under Code § 20-91(A)(9)

must:

> Affirm that the parties have lived separate and apart, continuously,
> without interruption and without cohabitation, and with the intent
> to remain separate and apart permanently, for the statutory period
> required by subdivision A(9) of § 20-91.

---

[5] Because Code § 20-106(B)(5) is not directly at issue in this case, this opinion addresses
Code § 20-106(B)(5) only to the extent necessary to address husband's contentions regarding its
bearing on Code § 20-91(A)(9).

Husband argues that the phrase "for the statutory period required by subdivision A(9) of § 20-91" modifies *every* preceding phrase, including "and with the intent to remain separate and apart permanently." Thus, husband argues, the General Assembly intends that the intent to remain separate and apart permanently must be maintained for the entire statutory waiting period.

Contrary to husband's contention, the phrase "for the statutory period" in Code § 20-106(B)(5) does not directly qualify the preceding phrase "and with the intent to remain separate and apart permanently." The words "and with" signal that the statute is structured to independently impose multiple constraints on the required separation period, not for those constraints to apply to each other. The structure of Code § 20-106(B)(5) includes two primary components. First, Code § 20-106(B)(5) requires a separation: "the parties have lived separate and apart." Second, Code § 20-106(B)(5) imposes five constraints on that separation, requiring that the parties live separate and apart (i) continuously; (ii) without interruption; (iii) without cohabitation; (iv) with the intent to remain separate and apart permanently; and (v) for the statutory period required by subdivision A(9) of Code § 20-91. Thus, Code § 20-106(B)(5) is structured so that each of the five conditions independently qualifies the separation, but no condition qualifies another condition. Accordingly, the condition "for the statutory period required by subdivision A(9) of § 20-91" specifies a duration for the separation, but does not directly specify a duration for "the intent to remain separate and apart permanently." Consistent with Code § 20-91(A)(9) and *Hooker*, a separation that *commences* with the intent to remain separate and apart permanently is a separation "with the intent to remain separate and apart permanently." Thus, Code § 20-106(B)(5) does not require a construction of Code § 20-91(A)(9)(a) that requires the intent to remain separate and apart permanently to be maintained throughout the separation period.

- 14 -

Finally, husband contends that requiring a continuous intent to separate permanently is needed to prevent the statutory waiting period from being satisfied by an extended business trip that commences with a "fleeting desire to separate permanently." In husband's hypothetical, after a year of separation in which neither party is contemplating divorce, a party could obtain a divorce based on the separation date. Husband's hypothetical fails because the hypothetical business trip after a *fleeting* desire to separate would not likely be accompanied by other indicia of marital separation, such as an *enduring* change of residence or the *discontinuation* of financial and other aspects of the marital partnership. In addition, such a separation would not be "without interruption"—as required by Code § 20-91(A)(9)—if the parties, though living far apart, subsequently reconciled.

Moreover, requiring a party to maintain the intent to separate permanently throughout the statutory separation period would discourage parties from engaging in meaningful efforts to reconcile. If husband's proposed statutory construction is adopted, divorce litigants could reasonably conclude that good-faith conciliatory efforts would make it more difficult to prove a persistent intent to permanently separate. Thus, husband's proposed construction of Code § 20-91(A)(9)(a) would undermine the legislative intent that the separation period afford an opportunity for husband and wife to meaningfully contemplate the decision to divorce and explore reconciliation. *See Coe*, 225 Va. at 620 (purpose of separation period is to provide an opportunity for reconciliation and to determine if the parties desire permanent separation).

C. *The separation was without interruption and without cohabitation.*

As necessarily found by the trial court, wife intended to separate permanently from husband when she moved into the Daniel Lewis property on July 14, 2014. After the 2014 separation date, wife continued to reside at the Daniel Lewis property and husband resided

- 15 -

separately at his apartment. Wife and husband maintained their own separate legal and mailing

addresses.

Code § 20-91(A)(9)(a) provides:

> A divorce from the bond of matrimony may be decreed . . . [o]n
> the application of either party if and when they have lived separate
> and apart without any cohabitation and without interruption for one
> year.

Although Code § 20-91 does not provide a precise definition of "without cohabitation and

without interruption," our cases have construed "cohabitation" in the context of divorce to

require more than intermittently sharing the same physical space. *See Colley v. Colley*, 204 Va.

225, 228 (1963). As explained in *Colley*:

> In ordinary usage and general understanding the verb "cohabit"
> means to live or dwell together *as husband and wife*, Webster's
> New Int. Dict., 2d ed., p. 520; Black's Law Dict., 3d ed., p. 347.
> "The term imports a dwelling together for some period of time, and
> does not include mere visits or journeys." 14 C.J.S., Cohabit,
> 1311.

*Id.* (emphasis added). Thus, a husband and wife resume *cohabitation* after a separation only if

they resume living together as husband and wife and resume the marital partnership with respect

to domestic and financial matters. *See Petachenko v. Petachenko*, 232 Va. 296, 299 (1986). As

explained in *Petachenko*:

> The "matrimonial cohabitation" consists of more than
> sexual relations. It also imports the continuing condition of living
> together and carrying out the mutual responsibilities of the marital
> relationship.

*Id.* Husband, citing *Rickman v. Commonwealth*, 33 Va. App. 550, 557 (2000), contends that the

fact that wife and husband maintained separate homes does not prove the absence of

cohabitation. Husband's reliance on the construction of the term *cohabitation* in *Rickman* is

misplaced. In *Rickman*, a case involving Code § 18.2-57.2 (assault and battery against a family

- 16 -

or household member), this Court expressly declined to adopt a construction of cohabitation borrowed from the divorce context. *Rickman*, 33 Va. App. at 556. Moreover, in addition to maintaining separate homes, husband and wife here did not carry out the mutual responsibilities characteristic of a marital partnership. *See Petachenko*, 232 Va. at 299.

Husband further contends that even if husband and wife's intermittent sleepovers do not constitute marital *cohabitation*, those contacts defeated the statutory requirement that the separation continue "without interruption." Husband argues that construing "without interruption" to only mean "without any cohabitation" would render one of those terms superfluous. "The rules of statutory interpretation argue against reading any legislative enactment in a manner that will make a portion of it useless, repetitious, or absurd." *Porter v. Commonwealth*, 276 Va. 203, 230 (2008) (quoting *Jones v. Conwell*, 227 Va. 176, 181 (1984)). However, construing "without interruption" to mean something different than "without cohabitation" does not imply that the separation is interrupted when husband and wife occasionally sleep in the same bed. Plainly, a separation is interrupted when it is terminated by reconciliation, even if the parties remained separated by great distances. Notwithstanding the numerous occasions husband and wife were together after the July 2014 separation date, there was no reconciliation. Accordingly, the trial court correctly held that husband's evidence of occasional sleepovers in which husband and wife shared a bed—but did not resume living together and sharing the responsibilities of a marital partnership—did not constitute marital *cohabitation*. The trial court also correctly held that these contacts did not *interrupt* the separation period that commenced on July 14, 2014. Without any evidence that the circumstances responsible for the breakdown of the marriage had been addressed, the trial court reasonably credited wife's testimony that the sleepovers were for the purpose of convenience relating to a continuing need for husband and wife to cooperate in the care of their children.

D. *Husband and wife did not reconcile after July 14, 2014.*

Husband also asserts that the trial court erred in finding the separation date to be July 14, 2014, because the parties subsequently reconciled. Husband contends that the parties' reconciliation is demonstrated by evidence of conciliatory efforts, family trips, and sporadic sleepovers. However, "[r]econciliation means more than simply cohabitation or the observance of civility; it comprehends a fresh start and *genuine* effort by both parties." *Jacobsen v. Jacobsen*, 41 Va. App. 582, 590 (2003) (citation omitted). "Reconciliation must exhibit proof that the parties intend to live together as husband and wife and take up their respective roles in the relationship." *Id.* "To prove reconciliation, the parties must resume matrimonial cohabitation with genuine intent." *Id.* at 591. Because husband and wife's contacts after the separation date—though numerous—do not show that the parties had the intent to live together as husband and wife and resume the marital relationship after the July 2014 separation date, we disagree with husband.

The trial court found that a primary factor contributing to the dissolution of the marriage was husband's failure to make any meaningful financial contributions to the marital partnership after husband and wife moved to France in 2000. The trial court further found that after wife provided husband with the "financial space" to explore career opportunities, husband "squandered" that opportunity by pursuing "unrealistic and financially unproductive endeavors." R. 514. In 2012, to ease the financial strain caused by husband's continuing failure to make financial contributions for rent and other family expenses, wife sold her solely owned condominium and used the proceeds to purchase the Daniel Lewis property as the family's new residence. But husband refused to move into the Daniel Lewis property, claiming it was too small. Consequently, wife rented out the Daniel Lewis property. Subsequently, on July 14, 2014, after her tenant vacated the property, wife moved into the Daniel Lewis property,

- 18 -

separating from husband with the intent to separate permanently. Husband then moved into his own apartment, changing his legal and mailing addresses accordingly. Thereafter, husband and wife continuously maintained separate legal residences.

It is undisputed that subsequent to the July 2014 separation date, wife made statements that husband and wife "belong together." After July 2014, wife occasionally expressed love and affection for husband. Wife also mused about the *possibility* of a reconciliation, stating that she "hope[d] it [was] not too late" for them. R. 1006. Husband and wife still occasionally called each other by the affectionate nicknames they used prior to their marital separation. In addition, husband and wife attended family functions together and occasionally slept in the same bed. Although husband and wife maintained separate legal residences since the 2014 separation date, husband and wife had keys to each other's homes. Husband also kept some of his belongings at the Daniel Lewis property for use during his visits.

With respect to the intermittent occasions when wife slept in the same bed as husband, or attended family functions with husband, wife explained that those occasions resulted from their continuing obligations to care for their children. Wife also explained that although she occasionally shared the same bed as husband, she did not resume marital relations with husband. None of the occasions in which wife shared a bed with husband included sexual or other passionate physical contact. Nevertheless, wife admitted having had continued affection for husband after the 2014 separation date.

Notwithstanding the substantial evidence that husband and wife continued to spend time together and engage in family activities, there is no evidence that husband and wife reconciled and resumed the marital relationship. *See Jacobsen*, 41 Va. App. at 590; *Roberts v. Pace*, 193 Va. 156, 161 (1951) (reconciliation requires more than occasionally sharing the same bed, taking trips together, and other "evanescent acts of marital relationship"). There is no evidence that

- 19 -

after the 2014 separation date, husband remedied or substantially mitigated his failure to financially contribute to the family—the cause of the financial tensions that the trial court found had contributed to the dissolution of the marriage. The statements and conduct of wife after the 2014 separation date, while consistent with the *possibility* of reconciliation and a resumption of the marriage, do not show that the trial court erred in expressly finding that the separation was continuous and uninterrupted, and in implicitly finding that husband and wife did not reconcile.

## CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment that the parties' separation period commenced on July 14, 2014. It follows that the trial court did not err in relying on the 2014 separation date when determining its equitable distribution award and spousal support award. For reasons stated in this Court's separate memorandum opinion addressing husband's other assignments of error, the trial court's judgment omitting husband's request for a spousal support reservation from the final decree is reversed. The portion of the trial court's equitable distribution award awarding the Daniel Lewis property is vacated. The trial court's spousal support award is vacated for reconsideration based on any modifications made to the equitable distribution award. The trial court's judgment is affirmed in all other respects. We remand this case to the trial court with instructions to enter a modified decree in accordance with this Court's separate memorandum opinion in this appeal.

*Affirmed in part, reversed in part, vacated in part, and remanded.*