COURT OF APPEALS OF VIRGINIA


Present:   Judges Elder, Alston and Senior Judge Clements
Argued at Richmond, Virginia


BARBARA J. SIMS
                                                                OPINION BY
v.        Record No. 3101-08-2                        JUDGE LARRY G. ELDER
                                                           DECEMBER 15, 2009
MARVIN JUNIOR SIMS


FROM THE CIRCUIT COURT OF HANOVER COUNTY
J. Overton Harris, Judge

> Paul H. Kunberger (Saunders, Cary & Patterson, on briefs), for
> appellant.
>
> Julie M. Cillo (Hall & Hall, PLC, on brief), for appellee.


Barbara J. Sims (wife) appeals a final decree of divorce that incorporated the property

settlement agreement she entered into with Marvin Junior Sims (husband).  Wife argues the trial

court erred by (1) finding that the agreement was not unconscionable; (2) ratifying the

agreement; (3) granting husband's motion to reconsider the ruling that the agreement was

unconscionable; and (4) refusing to retain jurisdiction over property omitted from the agreement.

We hold the trial court misinterpreted the controlling legal principles, and we conclude, based on

the facts found by the trial court, that the agreement was unconscionable and must be set aside.

Thus, we reverse and remand for further proceedings consistent with this opinion without

reaching wife's final assignment of error.

I.

BACKGROUND

"When reviewing a trial court's decision on appeal, we view the evidence in the light most favorable to the prevailing party, granting [that party] the benefit of any reasonable inferences." Congdon v. Congdon, 40 Va. App. 255, 258, 578 S.E.2d 833, 834 (2003).

The parties were married in 1968 and separated on August 11, 2006. Wife consulted an attorney, who requested financial information from husband. Husband retained an attorney, who responded to wife's attorney and provided the requested financial information, including information concerning husband's deferred profit sharing and retirement benefits. Wife could not afford to retain the attorney she had consulted, and she proceeded *pro se* for several months. Wife told husband she wanted half of everything. Husband did not want to sell the marital residence at that time because he was living in the residence and raising the parties' grandson there. As a result, he offered to pay wife $2,000 per month "until she had received half of everything that [they] owned." In late 2006 or early 2007, husband's attorney prepared a property settlement agreement and sent it to wife for her review, but wife refused to sign the agreement because it did not provide for the division of husband's retirement and deferred compensation.

Later, however, wife told several people, including husband's attorney and the parties' son, that she did not want anything from the marriage and just wanted a divorce. After learning of this from the parties' son, husband asked his attorney to prepare such an agreement. Wife telephoned husband's attorney on numerous occasions to say she "just want[ed] a divorce" and to inquire "how fast [she could] get one." In March 2007, husband's attorney prepared a second property settlement agreement and sent it to wife for her review. On March 12, 2007, wife went to the attorney's office to sign the second agreement.

Under the terms of the agreement, each party waived the right to spousal support and equitable distribution. Husband received the marital residence, which he valued at $300,000 at the time of the parties' separation, and assumed the related debt of approximately $100,000. Each party received the automobile and other tangible personal property in his or her possession. The agreement did not mention husband's deferred profit-sharing account, valued at approximately $128,000 at the time of the separation, and retirement benefits, from which he received approximately $2,400 per month after withholding for taxes and insurance. Pursuant to the agreement, wife received only the 1999 pickup truck and "yard sale" personal property in her possession, and husband agreed to hold her harmless on the debt secured by the marital residence. On April 11, 2007, wife returned to the office of husband's attorney and signed a waiver of service. Thereafter, husband's attorney proceeded to finalize the divorce and sent the necessary paperwork to the court.

Meanwhile, wife retained counsel, and on May 9, 2007, wife filed an answer and cross-bill, alleging the agreement was unconscionable. On April 17, 2008, the trial court held a hearing on the unconscionability issue. Wife offered evidence that she was "totally disabled" due to numerous health conditions but that she did not receive disability. She said she applied for Medicaid but did not qualify because her name was on the title for a relatively new vehicle that husband had in his possession and she "couldn't get it out of [her] name to get the Medicaid back." She was receiving food stamps and borrowing money from family and friends "to try to get by." Regarding her disabilities, wife testified she suffered from depression, high blood pressure, rheumatoid arthritis, and diabetes and that she had had a foot fusion and dual hip, knee, and knuckle replacements. She said she took medication for her depression, insulin for her diabetes, and used morphine and Percocet for pain. Wife testified she had been using these

medications for twenty years, including "at the time she signed th[e] agreement." She had health insurance at the time because she was still covered on husband's policy.

Wife denied reading the agreement before signing it and said she did not understand its legal impact other than that "it would let [her] get a divorce." She admitted, however, that she refused to sign the initial agreement because it did not provide her with a share of husband's retirement and deferred compensation benefits and that by the time she signed the second agreement, she understood the "[h]ouse and car and truck and retirement and profit sharing" were the assets comprising the marital estate. She conceded she probably received a copy of the agreement in advance and that she just wanted a divorce. She admitted she had a "seasonal business" picking boxwood and running pine for a florist in exchange for "a little spending money."

Wife offered testimony from her twin sister corroborating her testimony about her "severe" medical conditions and the fact that she routinely took morphine. Wife's sister also testified that wife "does [not] read . . . well," "doesn't comprehend hardly at all," "does [not] . . . exercise good judgment," and "is not always thinking clearly."

Husband admitted wife had mood swings, which he did not attribute to her medical conditions, and he conceded she had told him she took medication for pain and depression. He said he first learned that wife did not want anything from the marital estate when the parties' son called him and told him about wife's statements to that effect. Husband admitted he felt lucky when he learned wife did not want anything.

The parties' son conceded wife had "frequent[]" mood swings and that her decision to relinquish one hundred percent of the marital estate to husband was "not a good judgment." The son also said mother's medical conditions were "[a]s severe as she would like for them to be." When asked to explain, he indicated that as he was growing up, his mother's medical conditions

did not seem to prevent her from doing what she wanted to do but that she always seemed to be "hurting, aching," "if she didn't want to clean the house or whatever."

Husband offered evidence from his attorney indicating that wife conveyed her understanding of the first agreement when she refused to sign it because it did not address husband's pension and profit sharing. The attorney also indicated he first learned wife had changed her mind about the property division when she contacted him directly, indicating that she wanted a divorce quickly and "[didn't] want anything from [husband]." The secretary in husband's attorney's office who notarized wife's signature on the second agreement testified that she took wife to the law firm's conference room, gave her the document and asked her read it, after which wife appeared to be doing so. When wife said she was finished reading it, the secretary inquired whether wife had any questions. She also inquired whether wife understood everything, and wife indicated that she did. The secretary testified wife did not appear to be mentally impaired at any point during the encounter.

After hearing the evidence and argument of counsel, the trial court found the agreement was unconscionable "[o]n the basis of O'Bryan [v. O'Bryan, No. 1912-91-4 (Va. Ct. App. July 28, 1992)]," which the court relied on as providing that a gross disparity in the division of marital assets, standing alone, "if . . . great [enough]," is sufficient to support a ruling that an agreement is unconscionable.

Husband filed a motion for reconsideration, which the trial court granted. The trial court found that "while hardly an exaggeration to say that this is about as grossly disparate a deal as probably anybody has ever seen, it's not entirely true that [wife] didn't get some value out of it. She got held harmless on loans and mortgages and things like that." The trial court concluded under Galloway v. Galloway, 47 Va. App. 83, 622 S.E.2d 267 (2005), that the agreement was valid and not unconscionable because wife proved only a gross disparity in the value of the

division and failed, based on the testimony of husband's former attorney and the attorney's secretary, to meet her burden of proving husband engaged in overreaching and oppressive behavior.

Wife filed a motion asking the court to retain jurisdiction to divide omitted property, arguing that husband omitted property, including retirement benefits and other assets, from the agreement. Husband sought entry of a final decree incorporating the agreement. On December 5, 2008, the trial court entered the final decree incorporating the agreement and denied wife's motion to retain jurisdiction. Wife noted this appeal.

II.

UNCONSCIONABILITY OF THE AGREEMENT

In her first three assignments of error, wife argues the trial court erred in granting husband's motion for reconsideration, concluding that the agreement was not unconscionable, and incorporating the agreement into the final decree. We agree and hold the agreement was unconscionable on the facts of this case.

"Any issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law. Recitations in the agreement shall create a prima facie presumption that they are factually correct." Code § 20-151(B); see Code § 20-155 (providing that Code § 20-151 applies to marital agreements as well as premarital agreements).

> While the question of unconscionability is a matter of law, the underlying facts must be determined by the fact finder, and on appeal we determine whether there is sufficient evidence to support the factual findings. If there is credible evidence in the record supporting the factual findings made by the trier of fact, we are bound by those findings regardless of whether there is evidence that may support a contrary finding.

Galloway, 47 Va. App. at 92, 622 S.E.2d at 271.

> [W]hen "faced with a record of historical facts that supports conflicting inferences" a court reviewing the sufficiency of the

- 6 -

evidence "must presume -- *even if it does not affirmatively appear in the record* -- that the trier of fact resolved any such conflicts in favor of the [party that prevailed below], and must defer to that resolution."

Harper v. Commonwealth, 49 Va. App. 517, 523, 642 S.E.2d 779, 782 (2007) (quoting Jackson v. Virginia, 443 U.S. 307, 326, 99 S. Ct. 2781, 2793, 61 L. Ed. 2d 560, 578 (1979)) (emphasis added).

Here, the recitations in the agreement state that "each party considers the terms of this Agreement to be FAIR and EQUITABLE not UNCONSCIONABLE; and entered into VOLUNTARILY for valuable CONSIDERATION." Therefore, pursuant to Code § 20-151(B), the presumption is that the agreement is not unconscionable.

Wife "had the burden at trial to prove by clear and convincing evidence the grounds alleged to void or rescind the agreement." Drewry v. Drewry, 8 Va. App. 460, 463, 383 S.E.2d 12, 12 (1989). In a typical case alleging unconscionability of a marital agreement, the court must consider (1) whether "a gross disparity existed in the division of assets and [(2)] [whether the evidence shows] overreaching or oppressive influences." Galloway, 47 Va. App. at 92, 622 S.E.2d at 271; see also Shenk v. Shenk, 39 Va. App. 161, 179 n.13, 571 S.E.2d 896, 905 n.13 (2002). "[G]ross disparity in the value exchanged is a *significant* factor in determining whether oppressive influences affected the agreement to the extent that the process was unfair and the terms of the resultant agreement unconscionable." Derby v. Derby, 8 Va. App. 19, 28, 378 S.E.2d 74, 79 (1989) (emphasis added), quoted with approval in Chaplain v. Chaplain, 54 Va. App. 762, 773, 682 S.E.2d 108, 113 (2009). Proof of the "overreaching or oppressive influences" prong may be established in either of two ways:

> "When the accompanying incidents are inequitable and show [(a)] bad faith, such as concealments, misrepresentations, undue advantage, [or] oppression *on the part of the one who obtains the benefit*, or [(b)] ignorance, weakness of mind, sickness, old age, incapacity, pecuniary necessities, and the like, *on the part of the*

*other*, these circumstances, combined with [evidence of the first prong,] inadequacy of price, may easily induce a court to grant relief, defensive or affirmative."

Derby, 8 Va. App. at 28-29, 378 S.E.2d at 79 (quoting Pomeroy, Equity Jurisprudence § 928 (5th ed. 1941)) (emphases added).

Wife argues first that, in keeping with the trial court's initial ruling, a gross disparity in the outcome is sufficient, standing alone, to prove that the agreement here was unconscionable and that proof of oppressive influence is not required in all cases. We need not decide whether or under what circumstances gross disparity may be enough because we hold as a matter of law under the facts of this case that gross disparity *in conjunction with* pecuniary necessity on the part of the disadvantaged spouse establishes unconscionability.[1]

In the case of a marital agreement, "[w]hile no fiduciary duty exists between the parties, marriage and divorce creates a relationship which is particularly susceptible to overreaching and oppression," and we have noted several reasons why courts should scrutinize separation agreements more carefully than ordinary contracts. Id. at 29, 378 S.E.2d at 79. Among those reasons are the fact that "the relationship between husband and wife is not the usual relationship that exists between parties to ordinary commercial contracts" and that "[p]articularly when the negotiation is between the parties rather than between their lawyers, the relationship creates a situation ripe for subtle overreaching . . . ." Id. We also recognized that in cases involving

---

[1] In Derby, 8 Va. App. at 28, 378 S.E.2d at 79, we cited Smyth Bros. v. Beresford, 128 Va. 137, 169-70, 104 S.E. 371, 381-82 (1920), for the proposition that, "If inadequacy of price or inequality of value are the only indicia of unconscionability, the case must be extreme to justify equitable relief," thereby implying that, on appropriate facts, gross disparity in the value exchanged may be sufficient by itself to establish unconscionability. In Galloway, 47 Va. App. at 90-91, 622 S.E.2d at 270-71, we quoted this language from Derby but also rejected the claim of Mrs. Galloway "that 'gross disparity,' with nothing more, should render the agreement void as being unconscionable," id. at 92, 622 S.E.2d at 271. We think a proper synthesis of these principles, in light of our holdings in Shenk, Galloway, and Chaplain, is that when gross disparity is so extreme as to prove "pecuniary necessities," it establishes both prongs of the unconscionability test.

separation agreements, "unlike commercial contracts, the state itself has an interest in the terms and enforceability of [the] agreement[]" because, "[i]f either spouse is left in necessitous circumstances by a separation agreement, that spouse . . . might become [a] public charge[]." Id.

The holding in Galloway is illustrative. Galloway involved the husband's receipt of what we concluded was approximately 94% of the marital assets[2] pursuant to the parties' agreement, which we merely assumed established the first prong of the unconscionability test. 47 Va. App. at 92-93, 622 S.E.2d at 272. The wife pointed to her waiver of spousal support as an additional circumstance supporting a finding of unconscionability, but we noted the wife was employed throughout the marriage, which lasted seventeen years, and testified "she could easily obtain a job as a secretary." Id. at 86, 88, 93-94, 622 S.E.2d at 268, 269, 272. Also, the wife had been employed as a nurse's aide for twenty years and then with husband in his heating and air conditioning business for eleven years, during which time she worked as an installer. Id. at 86, 622 S.E.2d at 268. The trial court found no evidence that the wife "suffered from any disability or necessity," and we concluded the evidence proved she was "not penniless." Id. at 89, 94, 622 S.E.2d at 270, 272. In addition to the fact that the wife retained her pension from working for twenty years as a nurse's aide, approximately half of which was marital but apparently was not included in the separation agreement, the evidence established "[the wife] had inherited $30,000 cash and a home with no debt valued at $275,000." On these facts, we held "[n]othing in the record suggests [the wife] is incapable of enjoying financial independence." Id. at 94, 622 S.E.2d at 272.

---

[2] The opinion does not make clear how this 94% figure was calculated. Using a value for the marital residence and business of $200,000, which the husband received, and a value of $11,000 for a pickup truck, which wife received, yields a split of 94.5% to the husband and 5.5% to the wife. However, these figures do not include the husband's civil service pension, four years of which accrued during the marriage, or the wife's nurse's aide pension, eleven years of which accrued during the marriage.

Here, by contrast, the evidence, viewed in the light most favorable to husband, establishes as a matter of law both "'inadequacy of price or inequality in value'" and "'pecuniary necessities" coupled with a degree of infirmity. Id. at 90-91, 622 S.E.2d at 270-71 (quoting Derby, 8 Va. App. at 29, 378 S.E.2d at 79). Proof of "'pecuniary necessities'" and infirmity satisfies the second prong of the unconscionability test without the need for separate proof of overtly "'oppressive influences'" exerted by husband or on his behalf. Id. at 91, 622 S.E.2d at 271 (quoting Derby, 8 Va. App. at 29, 378 S.E.2d at 79 (quoting Pomeroy, supra, § 928)). It is undisputed that wife, who had a third grade education and numerous health problems including diabetes, "frequent[]" mood swings, and rheumatoid arthritis for which she took pain medication,[3] was fifty-six years old at the time of the evidentiary hearing and had qualified to receive food stamps. Wife had married husband when she was sixteen and remained married to him for 38 years, during which time husband said her lack of education was a problem "to deal with" and interfered with his ability to teach her how to do things like "pay bills and stuff of this nature." Although wife had engaged in some employment outside the home during the marriage, wife testified she was totally disabled at the time of the evidentiary hearing due to her physical condition. Husband made no claim that wife was capable of supporting herself at the time of the divorce, and the evidence indicated her only recent employment had involved picking boxwood and pine for a florist during the winter months. Husband received all the marital assets with the exception of an automobile and the small amount of personal property in wife's possession, which husband testified consisted of "some of the stuff she had purchased over the years at yard sales." The parties' son agreed that, given wife's circumstances, her "relinquish[ing] 100 percent of the marital property" to husband was "not a good judgment." The trial court expressly found

---

[3] Husband disputed the *extent* of wife's disability from her various health conditions but did not dispute the existence of her diabetes, arthritis, and mood swings.

- 10 -

that "this is about as grossly disparate a deal as probably anybody has ever seen" and that the only value wife received was husband's agreement to hold her harmless on the debts secured by the marital residence, in which husband received the remaining estimated $200,000 of equity. Husband also received his deferred compensation account valued at $128,000 and his retirement benefits, which yielded $2,400 per month after withholding for taxes and insurance. The trial court further recognized the extreme disparity in this division and wife's resulting pecuniary need, concluding erroneously that although it "ha[d] to . . . deci[de]" that wife had not met the controlling legal standard, it found the agreement was "[un]fair," and it "strongly urge[d]" husband to do "the right thing" "morally."

Although the evidence supported the trial court's finding that husband did not engage in any *overt* overreaching or oppressive conduct, his act of entering into a contract with wife in which she waived spousal support and relinquished to him almost 100% of the marital estate— including the marital residence, all retirement benefits and deferred compensation—literally left her penniless with no practical means for supporting herself. These facts stand in marked contrast to those in Galloway, in which the wife had been employed outside the home throughout the couple's 17-year marriage, and had numerous job skills, a $275,000 home she inherited, and assets of her own. 47 Va. App. at 89, 622 S.E.2d at 270. On those facts, the trial court held in Galloway "'[t]here [was] no evidence . . . that wife suffered from any disability or necessity.'" Id.; see also Derby, 8 Va. App. at 29, 378 S.E.2d at 79 (recognizing that in cases involving separation agreements, "unlike commercial contracts, the state itself has an interest in the terms and enforceability of [the] agreement[]" because, "[i]f either spouse is left in necessitous circumstances by a separation agreement, that spouse . . . might become [a] public charge[]"). Here, the evidence established that wife had in fact already become a public charge, receiving food stamps, despite husband's retention of substantial marital assets. Thus, the evidence

- 11 -

established not only a gross disparity in the division of assets but also infirmity and pecuniary necessities which, in combination, established unconscionability.

III.

For these reasons, we hold the evidence, viewed in the light most favorable to husband, compels the conclusion that the agreement was unconscionable and must be set aside. Thus, we reverse and remand for further proceedings consistent with this opinion without reaching wife's final assignment of error.

Reversed and remanded.