UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:    Judges AtLee, Athey and Bernhard
Argued by videoconference


HOLLAND COLEMAN

                                                MEMORANDUM OPINION* BY
v.        Record No. 0299-25-3                  JUDGE CLIFFORD L. ATHEY, JR.
                                                FEBRUARY 24, 2026
PAMELA COLEMAN


FROM THE CIRCUIT COURT OF BUCHANAN COUNTY
Patrick R. Johnson, Judge Designate

Robert M. Galumbeck (Galumbeck Stiltner & Gillespie, Attorneys,
on brief), for appellant.

Terrence Shea Cook (T. Shea Cook, P.C., on brief), for appellee.


Holland Coleman ("husband") appeals from a final divorce decree entered on January 29,

2025, in the Circuit Court of Buchanan County ("circuit court") severing the bonds of marriage

between husband and Pamela L. Coleman ("wife"). Husband assigns error to the circuit court

for setting aside as unconscionable a property settlement agreement ("PSA") executed by

husband and wife. Husband further contends that since the PSA was not unconscionable and

therefore enforceable, the circuit court lacked jurisdiction to enter the final divorce decree

equitably distributing the parties' marital property and awarding spousal support to wife. For the

following reasons, we affirm the circuit court's judgment.

---

* This opinion is not designated for publication. *See* Code § 17.1-413(A).

I. Background[1]

On August 11, 2017, husband filed a complaint for divorce in the circuit court. The complaint alleged that the parties were married on November 18, 1990, and had no children. The complaint further alleged that the "parties have entered into a Separation and Property Settlement Agreement dated the 2nd day of February, 2017," which was attached to the complaint. In the complaint, husband asked the circuit court to "ratify, approve and confirm" the PSA and to incorporate the PSA in the decree of divorce. On August 25, 2017, wife answered the complaint, alleging that husband was "physically and mentally abusive during the entirety of the marriage" and therefore constructively abandoned the marriage. She also moved the circuit court to set aside the PSA "based upon unconscionability, duress, and coercion." Wife also requested spousal support.

Under the terms of the PSA, both husband and wife agreed to waive spousal support, and wife agreed to convey her interest in the marital home to husband. The PSA also required wife to convey to husband her interest in a jointly owned parcel of land in West Virginia. Husband was also to receive personal property including a 1971 Ford Mustang, a 1992 Chevrolet Corvette, a 1995 Ford F150, a 2000 Harley Davidson motorcycle, a boat and trailer, and a jet ski. Husband also was to retain

> the golf cart; four wheelers; the John Deer lawn mower; all hand tools and power tools; pictures; televisions; living room suites; the end tables; the dining table and chairs; all appliances; dishes; the bedroom suites; the other lawn equipment; all guns . . . and all other furniture and items located in the marital home.

Wife was only to receive a 2007 Volvo SUV and her parents' porch swing. Husband and wife also agreed to retain their own personal investment accounts and other intangible property and to

---

[1] We review the evidence in the light most favorable to wife, as the prevailing party below. *See Derby v. Derby*, 8 Va. App. 19, 26 (1989).

remove themselves as beneficiaries under their respective life insurance policies.[2] The PSA further provided that "any court entering a final decree of divorce affirm, incorporate and ratify, but not merge" the PSA into the final divorce decree. The PSA noted that it was prepared by husband's attorney and that wife did not receive legal counsel or advice from husband's attorney.

Following discovery, a hearing was held on October 16, 2018, to consider wife's motion to set aside the PSA. During the hearing, wife testified that the parties were married on November 18, 1990, and separated on February 2, 2017. Wife further testified that early in the marriage, husband broke her jaw because he was "mad" at her, resulting in her jaw being wired shut for six weeks. Wife explained that rather than telling her family what had occurred, she told her family that they "were playing around and he accidentally hit [her.]"

Wife also testified that in October of 2012, the couple took a trip to Knoxville, Tennessee. While on that trip, husband woke wife up early, telling her that the day was going to be "the happiest day [of] the rest of [her] life." Husband then proceeded to drive her to a private investigator's office, who conducted a lie detector test on wife concerning her alleged infidelity. Despite passing the polygraph examination, husband resumed his previous accusations that wife was lying, alleging that the polygraph examiner had lied for her.

Wife further testified that husband restricted her ability to use a cell phone and, on some occasions, would prevent her from leaving the house, either by blocking her vehicle or letting the air out of the vehicle's tires. Wife testified that on one such occasion, she fled the house on foot.

---

[2] The PSA also stated that

> [i]n the event that one party should breach this Agreement, or should both parties prevail as a result of the resolution of more than one issue in controversy between the parties, a court of competent jurisdiction may apportion the award of attorney's fees and costs in such manner as it deems equitable under the circumstances.

Wife also testified that husband demanded that she sign the PSA and advised her that she "would not leave there without signing those papers." Wife further testified that husband told her that she "would never leave without signing all of the titles of everything [they] had over to him."

Wife explained that in the summer of 2016, husband took her to see an attorney, Jeffrey Stowers ("Stowers"), to get a "no-fault divorce." Husband chose Stowers without consulting with wife, and husband failed to provide wife with any documents pertaining to a potential divorce settlement prior to the meeting with Stowers. During the meeting with Stowers, husband "became real hostile" and raised his voice when the topic of the division of marital property came up. Wife testified that husband stated in the meeting that "all of this belonged to him" and that wife "could not have" any of the marital property. Wife also testified that Stowers advised her during the meeting that he "ha[d] to represent" her husband.

Wife became upset and left the meeting. After Stowers and husband finished their meeting, Stowers suggested that husband and wife "have lunch together" and "he would have the papers ready to sign when [they] came back." Wife stated that she could not eat during lunch and when they returned to Stowers's office, Stowers gave her some documents to review for the first time. She further testified that Stowers never offered to discuss the terms of the PSA with her, only telling her to look it over. Wife testified that although Stowers advised her she had the right to have an attorney review the PSA, husband "wo[uldn't] allow [her] to have an attorney" and that she "ha[d] to sign these, or he'll kill me." Wife then told Stowers that husband "had held a gun on [her] and that there was no way that [she] could leave [the meeting] without signing everything to him." Wife further testified that Stowers acknowledged, "[W]e can not legally let you sign these papers because they won't stand up in [c]ourt because of distress." Nevertheless, wife felt she "ha[d] to sign" the papers because there was "no other way" to be free from her husband. Wife testified that at the time of the meeting, she did not want a divorce.

Instead, she wanted to remain married and "gave in" and "stuck by his side." Ultimately, wife did not sign the PSA that day, and husband and wife went home.

Wife testified that on February 2, 2017, husband again told her that they "were going to get a divorce." Husband demanded "that [she] sign all those titles over to him, and then, he would decide and give [her] what he wanted to." Wife recounted that husband "told [her] that it was time" and asked if "this [was] really what [wife] want[ed]." Wife replied, "[N]o, this is not what I want." Wife then testified that husband drove her to Stowers's office again and they were directed to enter a conference room where "the papers [were] laid out" but there "wasn't an attorney" present in the conference room. Wife glanced at the PSA while thinking, "I just can't believe this." Husband was "st[anding] over [her] shoulder" during this time. Wife testified that she ultimately signed the PSA but she "had no choice." After wife signed the PSA, husband was "crying" and said that "this is not what he wanted." Wife accepted $500, some personal effects, and left the marital home the next day.[3] At the conclusion of wife's case in chief, the circuit court continued the hearing to June 10, 2019, to permit husband to present his evidence "due to the lateness of the hour."

On June 10, husband presented his evidence pertaining to the execution of the PSA. Husband moved multiple depositions into evidence, including his deposition and the depositions of Stowers, wife, and wife's sister, Linda Quesenberry. In his own deposition, husband stated that wife would lie to him and "made [him] think she was running around on" him. Husband testified that he would confront wife about "flirting with other guys" and wife would "lie to [him] and do it right in front of [him]." When asked about the meeting with Stowers in 2016, husband stated that he "really [didn't] know what was said" and "ha[d] no recollection" of

---

[3] The couple briefly reconciled for about a week in March of 2017, but the relationship quickly deteriorated again. The hearing also included testimony from wife's parents and one of Stowers's former legal secretaries, who corroborated parts of wife's testimony.

Stowers preparing the PSA while husband and wife went to lunch. Husband also testified that wife was "the one that made [him] . . . take her to the attorney" and asserted that he "took her back home three (3) times that day, trying to talk her out of it." When asked about wife's statement that husband had held a gun to her head, husband responded, "That beats me." He reiterated that wife was "going to sign" the PSA and even "begged" to sign it "several times." When asked about how wife broke her jaw, husband stated that the couple were having an argument in a car when wife attempted to jump out of the car. Husband testified that he tried to "reach over to try to catch her" and "accidentally[] hit her." Husband said that he caught her and that wife ultimately did not jump out of the car. However, husband further stated that he "missed her" and that he "must have caught her on the jaw or whatever."

Wife filed her post-hearing memorandum on July 8, 2019, and husband responded by filing his own memorandum on July 31, 2019. The circuit court issued a letter opinion on March 5, 2020, in which the court found that there was "a gross disparity in the value exchanged between the parties" in the PSA, with wife receiving only "2.5% of the marital estate." The circuit court also found that wife was receiving disability payments, qualified for food stamps, and had numerous health problems. The circuit court further found that if the PSA were enforced, wife would waive all current and future spousal support. The circuit court also found that wife had established both her "pecuniary necessities and infirmity." The circuit court then found that the "facts indicate[d] a history of oppressive influence" by husband over wife. Based upon its findings, the circuit court observed that "the unconscionable nature of [the PSA] and the circumstances surrounding its signing have established its illegitimacy." As a result, the circuit court concluded that the PSA was unconscionable and directed that the PSA be set aside and not incorporated in the final decree of divorce. The circuit court directed wife's counsel to prepare an order consistent with the letter opinion and circulate it for endorsement.

On March 11, 2020, counsel for wife sent husband's counsel a proposed divorce decree consistent with the circuit court's letter opinion. The proposed divorce decree granted the parties a divorce and bifurcated the issues of equitable distribution and spousal support, which were to be taken under advisement. In response, husband did not endorse the order but instead filed a "Motion and Memorandum for Reconsideration or Entry of a Final Appealable Order" on June 8, 2020. Husband's motion requested that the circuit court reconsider its letter opinion or enter an appealable final order. Wife filed her response to the motion for reconsideration on July 13, 2020, and moved for her proposed decree of divorce to be entered and for an award of temporary spousal support.

On August 25, 2020, the circuit court heard husband's motion for reconsideration of the letter opinion and wife's request to issue the proposed divorce decree. During husband's argument in support of his motion for reconsideration, the circuit court interrupted husband's counsel and clarified that issues of equitable distribution "[were] not before the [c]ourt" and that the "only issue that was before the [c]ourt was the validity of the [PSA]." Husband's counsel agreed with the court's pronouncement. Counsel for husband then agreed to set the matter of temporary spousal support for a pendente lite hearing and addressed wife's motion for entry of the proposed decree of divorce. Husband asserted that wife's counsel was asking the circuit court "to sever the divorce from the equitable distribution" but that the circuit court could not do that "unless it is shown that the issues are complicated and that there is a necessity. There's been no showing of necessity or complicated issues for you to bifurcate." Husband's counsel then noted that "obviously, if we lose this argument today, we're going to appeal the case" and further observed that "I don't think that [the circuit court] is in a position to grant a divorce yet" because the circuit court had not "heard evidence on the divorce." The circuit court clarified that a

divorce had not been granted yet in the case and stated that "the [c]ourt can bifurcate" and that "this case has been complex enough to do that."

Husband's counsel next asked the circuit court, "regardless of which way the [circuit court] rules on the agreement, to make it a final order." Husband's counsel stated that he had "done some research, but not completely on how you can make it a final appealable order," because otherwise the parties would "go through an entire divorce proceeding" and would "have to appeal it afterwards." The matter was briefly recessed for the circuit court to handle another matter, and when the matter was recalled on the record, husband's counsel asked wife's counsel if they were "on the same page as to wanting to make this a final order." After wife's counsel indicated that he wanted to discuss whether to agree to request the entry of an appealable order with his client, the circuit court stated to counsel for both parties that it was going to deny the motion for reconsideration of its letter opinion and told both counsel that "[y]ou all fashion the order [how]ever you've agreed to do it."[4]

On July 21, 2021, the circuit court entered the parties' agreed order, which 1) granted the parties a divorce on the grounds that they had lived separate and apart for more than one year; 2) denied husband's motion for reconsideration of the February 27, 2020 letter opinion; 3) ordered that the PSA be set aside as unconscionable for the reasons stated in the February 27, 2020 letter opinion; 4) ordered temporary spousal support of $700 a month; 5) took under advisement the parties' requests for attorney fees; and 6) continued the matter for determination of equitable distribution, "as well as the appeal of [the circuit court's] findings as to the property settlement agreement." The order was acknowledged in writing as "SEEN" by both counsel for wife and counsel for husband. Husband then attempted to appeal from the July 21, 2021 order, but this

---

[4] After hearing evidence at a pendente lite hearing on September 22, 2020, the circuit court entered temporary spousal support to wife.

Court dismissed his appeal because it did not have jurisdiction over the circuit court's interlocutory order. *See Coleman v. Coleman*, No. 0854-21-3, slip op. at 1 (Va. Ct. App. Mar. 29, 2022). That opinion noted that although husband argued the circuit court erred in "attempt[ing] to bifurcate the divorce decree," the "narrow issue" before this Court was "husband's motion for reconsideration" and the circuit court's "refusal to incorporate the PSA." *Id.*, slip op. at 2 n.1. The Supreme Court of Virginia refused husband's petition for appeal.

On January 3, 2023, husband filed a motion to dismiss in the circuit court, contending that the circuit court lacked jurisdiction to rule on equitable distribution because it failed to state in its July 21, 2021 order that reserving the issue of equitable distribution was "clearly necessary." Wife responded in opposition to the motion to dismiss on February 6, 2023. On July 31, 2023, the circuit court issued a letter opinion in which the circuit court denied husband's motion to dismiss. In explanation, the circuit court initially found that "it did not have the authority to retain jurisdiction in this case at the time of entry of the [f]inal [d]ecree" because "it never made a finding that the bifurcation was clearly necessary." However, the circuit court reasoned that because husband failed to object to the July 21, 2021 order, instead simply noting that the order was "seen," husband's untimely objection to the circuit court's jurisdiction concerning bifurcation of equitable distribution and spousal support as argued in his January 3, 2023 motion was waived. Thus, the circuit court held that under the law of the case doctrine and binding Virginia case law, the circuit court retained jurisdiction concerning equitable distribution and spousal support. On September 6, 2023, the circuit court entered an order denying husband's motion to dismiss for the reasons previously stated in its July 31, 2023 letter opinion.

Husband filed renewed motions to incorporate the PSA in the final divorce decree and a motion to dismiss the case for lack of subject matter jurisdiction concerning equitable distribution and spousal support. By letter opinion dated April 29, 2024, the circuit court denied

husband's renewed motions and directed for equitable distribution of the marital property. Husband filed a list of objections on the same day, again arguing that the PSA should have been incorporated and as to subject matter jurisdiction.

On January 29, 2025, the circuit court entered a final divorce decree granting the parties a divorce, ordering husband to pay spousal support to wife, and directing equitable distribution of the marital property as set forth in its April 29, 2024 letter opinion. Husband filed a memorandum of objections to the final divorce decree and appealed.[5]

## II. ANALYSIS

### A. *Standard of Review*

We review de novo whether a marital agreement is unconscionable. *See* Code §§ 20-155, -151(B). "While the question of unconscionability is a matter of law, the underlying facts must be determined by the fact finder, and on appeal we determine whether there is sufficient evidence to support the factual findings." *Galloway v. Galloway*, 47 Va. App. 83, 92 (2005). "If there is credible evidence in the record supporting the factual findings made by the trier of fact, we are bound by those findings regardless of whether there is evidence that may support a contrary finding." *Id.*

It is well-settled that "[w]hether the record establishes subject matter jurisdiction in a particular case is a question of law reviewed de novo on appeal." *Ruderman v. Pritchard*, 76 Va. App. 295, 302 (2022) (citing *Parrish v. Fed. Nat'l Mortg. Assoc.*, 292 Va. 44, 49 (2016)). During such review, appellate courts are "not limited to the arguments raised by the parties." *Id.* (quoting *Parrish*, 292 Va. at 49).

---

[5] Wife appealed but has withdrawn her cross-appeal.

B. *The circuit court did not err in setting aside the PSA as unconscionable.*

Husband argues that the PSA was not unconscionable because wife has not met her burden to establish unconscionability. We disagree.

"Any issue of unconscionability of a premarital agreement shall be decided by the court as a matter of law. Recitations in the agreement shall create a prima facie presumption that they are factually correct." Code § 20-151(B); *see* Code § 20-155 (applying Code § 20-151 to marital agreements). "[M]arital property settlements entered into by competent parties upon valid consideration for lawful purposes are favored in the law and such will be enforced unless their illegality is clear and certain." *Derby v. Derby*, 8 Va. App. 19, 25 (1989) (alteration in original) (quoting *Cooley v. Cooley*, 220 Va. 749, 752 (1980)). Wife "had the burden at trial to prove by clear and convincing evidence the grounds alleged to void or rescind the agreement." *Drewry v. Drewry*, 8 Va. App. 460, 463 (1989).

"When a court considers whether a contract is unconscionable, adequacy of price or quality of value transferred in the contract is of initial concern." *Id.* at 472. The party seeking to set aside an agreement as unconscionable "must prove both 1) a gross disparity existed in the division of assets and 2) overreaching or oppressive influences." *Galloway*, 47 Va. App. at 92. Other cases have held that "when gross disparity is so extreme as to prove 'pecuniary necessities,' it establishes both prongs of the unconscionability test." *Sims v. Sims*, 55 Va. App. 340, 350 n.1 (2009). In any event, "[c]ourts must view the apparent inequity in light of other attendant circumstances to determine whether the agreement is unconscionable and should be declared invalid." *Galloway*, 47 Va. App. at 92. "In the case of a marital agreement, '[w]hile no fiduciary duty exists between the parties, marriage and divorce creates a relationship which is particularly susceptible to overreaching and oppression.'" *Sims*, 55 Va. App. at 350 (alteration in original) (quoting *Derby*, 8 Va. App. at 29).

Here, the terms of the PSA establish a gross disparity in the division of assets. Under the terms of the PSA, wife waived any spousal support, and husband would have sole control of the marital residence as well as a parcel of land. In addition, husband would retain three vehicles, a motorcycle, a boat and trailer, and a jet ski. He also would retain a golf cart, four wheelers, a lawn mower, all furniture, and nearly all the other items in the marital home, save for an SUV for wife and a porch swing. Under the terms of the PSA, wife would retain only a small percentage of the marital assets and no spousal support. Thus, the record supports the circuit court's determination that a gross disparity existed in the division of assets. *See Derby*, 8 Va. App. at 30 (finding that a gross disparity existed where one spouse became "sole owner of the bulk of the parties' marital property").

The record is also replete with evidence of husband's overreaching or oppressive influences. Wife testified that husband broke her jaw because he was "mad," drove her to complete a polygraph examination while the couple was on vacation, and limited her ability to use a cell phone or leave the home. Wife also testified to a prior occasion where husband "held a gun" on her to try to force her to sign the agreement. Husband told wife that she would be unable to do as she wished if she did not sign the agreement. Wife was never represented by counsel, as husband did not allow her to obtain an attorney, and wife did not review the PSA prior to visiting husband's attorney. During the 2016 meeting with husband's attorney, husband was "hostile" and claimed ownership of all the marital property. And on the date the agreement was signed in 2017, husband told wife that she would sign the titles to everything over to him "and then[] he would decide" what to give to wife. Wife reiterated that she did not want a divorce but ultimately signed the agreement while husband was standing over her shoulder. Looking to the "other attendant circumstances," *Galloway*, 47 Va. App. at 92, in this case, the

circuit court did not err in setting the PSA aside.[6] *See Chaplain v. Chaplain*, 54 Va. App. 762, 774-75 (2009) (finding "oppressive circumstances surrounding the execution of the agreement" where wife had limited knowledge of English, had not discussed the terms of the agreement with husband, the agreement was opened only to the signature page, and wife did not have counsel).

C. *Husband did not timely object to the circuit court's July 21, 2021 order that bifurcated the issue of equitable distribution.*

Husband argues that the circuit court's July 21, 2021 order divested the circuit court of jurisdiction because the order did not expressly state that bifurcation of equitable distribution was "clearly necessary," pursuant to Code § 20-107.3(A).

"The court, on the motion of either party, may retain jurisdiction in the final decree of divorce to adjudicate the remedy provided by this section when the court determines that such action is clearly necessary, and all decrees heretofore entered retaining such jurisdiction are validated." Code § 20-107.3(A). We must first determine whether the circuit court made an "express" finding that bifurcation of equitable distribution was "clearly necessary." *See Christensen v. Christensen*, 26 Va. App. 651, 655 (1998) (holding that the circuit court "made no express finding that bifurcation of the proceedings was 'clearly necessary'" and the record did not support such a finding (emphasis omitted) (quoting Code § 20-107.3(A))); *Friedman v. Smith*, 68 Va. App. 529, 539-40 (2018) (noting that the circuit court "made an express finding that bifurcation was 'clearly necessary'" and stated so "both on the record and in its order").

---

[6] Husband argues that the circuit court erred by crediting wife's testimony but not crediting husband's testimony. On appeal, we do not second-guess the credibility determinations of the trier of fact. *See Bennett v. Commonwealth*, 84 Va. App. 607, 619 (2025) ("[T]his Court is mindful that '[d]etermining the credibility of witnesses . . . is within the exclusive province of the [fact finder], which has the unique opportunity to observe the demeanor of the witnesses as they testify.'" (second, third and fourth alterations in original) (quoting *Maust v. Commonwealth*, 77 Va. App. 687, 702 (2023) (en banc))).

Here, during the August 25, 2020 hearing, the circuit court noted that evidence regarding the grounds for the divorce had not been submitted to the court but stated that "the [c]ourt can bifurcate" and that "this case has been complex enough to do that." The circuit court's July 21, 2021 order continued the matter "for determination of issues relating to equitable distribution of the marital estate pursuant to Va. Code 20-107.3" and spousal support. Nothing in the record indicates that the circuit court stated it was "clearly necessary," and the circuit court explicitly acknowledged in its subsequent July 31, 2023 letter opinion that "it never made a finding that the bifurcation was clearly necessary." Thus, the circuit court did not expressly find that bifurcation was "clearly necessary," as required by Code § 20-107.3. *See Christensen*, 26 Va. App. at 655 (holding that the circuit court "must make a specific finding of clear necessity for granting the divorce while retaining jurisdiction to decide equitable distribution issues").

Although the circuit court failed to include "express" language that bifurcation was "clearly necessary," we must also examine whether there was a timely objection to the circuit court retaining jurisdiction and proceeding with a separate equitable distribution hearing. *Friedman*, 68 Va. App. at 539-40. We hold that there was not.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable the Court of Appeals to attain the ends of justice." Rule 5A:18. A statement of "seen and objected to" is insufficient to preserve an issue for appeal. *Lee v. Lee*, 12 Va. App. 512, 515 (1991) (en banc). "The purpose of Rule 5A:18 is to allow the trial court to correct in the trial court any error that is called to its attention." *Id.* at 514.

Our decision in *Erickson-Dickson* controls here. *See generally Erickson-Dickson v. Erickson-Dickson*, 12 Va. App. 381 (1991). There, the circuit court granted the wife a final divorce and reserved the issue of equitable distribution, referring it to a special commissioner.

*Id.* at 383.  The husband "made a general objection to granting the wife a divorce and endorsed the decree as 'seen and objected to'" but neither "specif[ied] any particular aspect of the court's findings or rulings which he considered objectionable," nor objected to "the ruling in the decree which deferred adjudication of the equitable distribution issues." *Id.*  After the special commissioner recommended a monetary award to the wife, the commissioner raised the issue of jurisdiction for the first time to the circuit court.  *Id.* at 384.  Only after this did the husband object that the circuit court did not have jurisdiction to adjudicate the issues of equitable distribution.  *Id.*

On appeal, we held that the circuit court retained jurisdiction when it "granted a final divorce and 'reserved' the issue of equitable distribution" but found that other pre-requisites of the statute had not been met.  *Id.* at 384-85.  Thus, we found that the circuit court had "fail[ed] to abide by the limitations of Code § 20-107.3" but noted that "the statute is silent as to whether the divorce is void or voidable because complete relief was not granted, or whether, how, or to what extent the parties may proceed with equitable distribution." *Id.* at 386.  We held that "[w]hen the court has acquired jurisdiction over the parties and the subject matter, and its continued exercise of that jurisdiction requires a ruling which depends upon factual determinations, an error in deciding the facts or the failure to decide them does not render the ruling void or a nullity" but does render the ruling "voidable and subject to challenge on direct appeal." *Id.* at 388-89.  Critically, we held that "[w]here the continued exercise of a special statutory jurisdiction depends upon proof of a fact or facts, the court has the power to make an erroneous factual finding, and the court acquires jurisdiction *where that erroneous factual finding goes unchallenged.*" *Id.* at 389 (emphasis added).  Finding that the husband's "endorsement of the decree as 'seen and objected to' did not comply with Rule 5A:18," we affirmed the ruling of the circuit court.  *Id.* at 389-90.

Further amendments to Code § 20-107.3 changed what findings must be made by the circuit court before bifurcation, but these "subsequent amendments [did] nothing to clarify" the situation as presented in *Erickson-Dickson* and thus we have adhered to that decision in later cases. *Christensen*, 26 Va. App. at 653. In *Christensen*, the husband and wife each sought a divorce against the other. *Id.* When the court indicated that it was going to enter a decree of divorce but also not rule on equitable distribution, the husband objected "because the bifurcation was not 'clearly necessary.'" *Id.* Nevertheless, the court granted a divorce and ordered that "the parties reserve their right to an equitable distribution." *Id.* at 654. On appeal, husband argued that because the court had erred in bifurcating the proceedings, that the Court of Appeals "should set aside the decree of divorce" and remand the case. *Id.* at 653. We held that the court had erred, but that it did not render the divorce decree invalid for lack of subject matter jurisdiction, finding that "this Court's rationale in *Erickson-Dickson* is equally applicable to the facts of this case." *Id.* at 656-57.

Other cases from our Court have highlighted the differences between *Erickson-Dickson* and *Christensen*. *See generally Spriggs v. Spriggs*, 43 Va. App. 510, 513-14 (2004). In *Spriggs*, the court entered a divorce decree that "reserve[d] to the [wife], equitable distribution rights to marital assets of the parties and permanent spousal support." *Id.* at 511. Husband "did not object to the divorce decree and did not appeal after the judge entered the decree." *Id.* Six years later, wife moved the court for equitable distribution, but the court denied the motion because under *Christensen*, it had not made a finding that bifurcation was "clearly necessary." *Id.* at 512. On appeal, we reversed the court below, holding that because "neither party challenged" the divorce decree "by objecting or appealing," the divorce decree "'became and remains the law of the case.'" *Id.* at 512-13 (quoting *Walt Robbins, Inc. v. Damon Corp.*, 232 Va. 43, 49 (1986)). We noted that *Christensen* was inapplicable because it "was based on a procedural posture

different than this case" because it involved "a *direct appeal* from the divorce decree." *Id.* at 513.

Here, the July 21, 2021 order of the circuit court granted the parties a divorce and denied the incorporation of the PSA. It continued the matter "on the docket for determination of issues relating to equitable distribution of the marital estate" pursuant to Code § 20-107.3, "as well as the appeal of [the circuit court's] findings as to the property settlement agreement." This order had been jointly crafted by agreement between husband's counsel and wife's counsel, and husband only marked the order as "SEEN" but did not include any objections. *Weidman v. Babcock*, 241 Va. 40, 44 (1991) ("[A] party's failure to object to a final order by merely endorsing it as "Seen," without more, is not sufficient to preserve that party's right to appeal."). And during the hearing on husband's motion for the circuit court to reconsider its letter opinion, there had not yet been a divorce decree entered. The circuit court clarified that the only issue before the circuit court was "the validity of the property settlement agreement," to which husband's counsel agreed. Despite arguing that there was "no showing of necessity or complicated issues" requiring the circuit court to bifurcate, husband's counsel stated that the circuit court could not grant a divorce yet because it had not heard evidence on the divorce. But yet, the agreed-upon final order that was jointly drafted by both parties and later signed by the circuit court granted the parties a divorce nevertheless. *See Erickson-Dickson*, 12 Va. App. at 383 (finding a "general objection" to granting a divorce and endorsing the decree as "seen and objected to" insufficient to preserve argument on appeal where counsel did not object to "the ruling in the decree which deferred adjudication of the equitable distribution issues").

Furthermore, on his first appeal to this Court, we noted that "the narrow issue before us is husband's motion for reconsideration and the trial court's refusal to incorporate the PSA" and that husband's "assignment of error encompasses merely the trial court's interlocutory decision

to deny his motion." *Coleman*, slip. op. at 2 n.1. Thus, unlike in *Christensen*, husband did not challenge the entry of the divorce order when it was entered, nor did he validly challenge it on appeal. Accordingly, husband has waived any challenge to the circuit court's July 21, 2021 order. *See Erickson-Dickson*, 12 Va. App. at 383 (holding that when appellant "did not make a timely objection to the trial court's ruling or its failure to make the required findings of fact" appellant "failed to preserve for appeal the question whether the evidence was sufficient to support the ruling to bifurcate the issues and to retain jurisdiction to consider equitable distribution issues"). Thus, we affirm the final judgment of the circuit court, as entered on January 29, 2025.

III. CONCLUSION

For these reasons, we affirm the judgment of the circuit court.

*Affirmed.*